G & A CONTRACTORS, INC., and Alaskan
Construction & Investment, Inc.,
Appellants,

v.

ALASKA GREENHOUSES, INC., Appellee.

No. 1763.

Supreme Court of Alaska.

Jan. 16, 1974.

Albert Maffei, Anchorage, for appellants.

Kenneth P. Jacobus of Hughes, Thorsness, Lowe, Gantz & Clark, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

## OPINION

CONNOR, Justice.

G & A Contractors, Inc. ["G & A"] and Alaskan Construction and Investment, Inc. ["ACI"] appeal from the June 8, 1972, judgment of the superior court, enjoining them from future siltation of Chester Creek and holding them jointly and severally liable in damages of $15,661.25 and prejudgment interest of $1,318.27. We have already affirmed the equitable portion

of the lower court's judgment. This opinion articulates in greater detail the reasons for that decision and in addition discusses the non-equitable questions presented in the appeal.

Plaintiff-appellee Alaska Greenhouses, Inc. ["Greenhouse"] is the family business of Mann Leiser, former horticulturist for the City of Anchorage. It engages in year-around retail greenhouse and horticultural activities. In 1969 it entered into a long-term lease, with option to purchase, of a 30-acre parcel of land located on the east side of Muldoon Road just south of Debarr Road. Unique to this parcel at the time of purchase was Chester Creek, which ran across the property in its natural condition. Leiser's plans at the time of purchase included using Chester Creek as the focus of a garden showplace, recreation area, and arboretum.

Defendants-appellants G & A and ACI are corporations owned or controlled by John Graham. At all times relevant to this case, G & A owned a 53-acre parcel of land bordering on and immediately south of the Greenhouse property. In its natural state, Chester Creek passed through the G & A tract in two places.[1] Graham had plans to develop the 53-acre G & A tract into a high-density, multi-family housing project. Those plans included the rerouting of Chester Creek. It is the two stream-diversion projects undertaken by the Graham corporations and others which form the subject matter of this case.[2]

In April or May 1970, Graham, through ACI, employed men to reroute the creek into a straight-line ditch along the common boundary line of the Greenhouse tract. It appears that much of this rerouting was undertaken before ACI had secured a permit to divert the stream.[3]

On June 19, 1970, the employees of one Tom Carey completed excavations on an "L-shaped" diversion in the northeast corner of the G & A tract. Carey, who was named as a defendant in the trial below, owned through Kobuk Investment Company a tract somewhat south of the G & A tract. This property Carey wished to develop as a trailer court, and in furtherance of this plan he excavated a drainage ditch along the eastern boundary of the G & A tract with Graham's permission. There apparently was an informal arrangement between Carey and Graham to the effect that Graham would allow Carey to run the ditch across the G & A tract, and in return Carey would do the digging across and square off the creek at the northeast corner of the G & A tract.

In the course of both excavation projects there were numerous trespasses on the Greenhouse property by heavy earthmoving equipment hired by Graham and later by Carey which caused extensive damage to trees and ground cover. Furthermore, because of design deficiencies in both ditches, erosion occurred in the process of drainage from both the Carey and the G & A tracts and sediment deposits developed in the portion of Chester Creek running across the Greenhouse lot.

Greenhouse sought to recover damages from G & A, ACI, and Carey for injury to its property and to the creek occasioned by the trespasses, and in addition sought an injunction against G & A and ACI to prevent future trespasses and future impairment of its riparian rights.

After a trial lasting nearly three weeks (and covering over 2000 pages of transcript), the court rendered extensive findings of fact and conclusions of law. The

---

1. The G & A tract drained into Chester Creek, and is upstream from the Greenhouse tract.

2. Appended to this opinion is a schematic diagram not drawn to scale but, for purposes of this opinion, illustrative of the relevant legal relationships.

3. AS 46.15.180 makes it a misdemeanor to "divert[s] . . . a significant amount of water from any source without a permit or certificate of appropriation . . . ."

findings in essence established the following:

1. As a direct result of the re-routings of Chester Creek described above, siltation of the creek has occurred on Greenhouse property. This is a continuing trespass for which G & A and ACI are 92½% jointly and severally liable.

2. G & A, ACI, and Tom Carey did not act reasonably in constructing either stream diversion project; their acts were the proximate cause of siltation build-up in the portion of Chester Creek on Greenhouse property.

3. Greenhouse uses its property for purposes peculiar to its business; therefore restoration is necessary.

4. ACI trespassed on Greenhouse property.

5. Greenhouse is entitled to an injunction against further pollution and a mandatory injunction requiring correction of past silt pollution. There is no adequate remedy at law. A diversion, drainage, and desiltation program should be carried out on both Greenhouse and G & A property in accordance with the plan proposed by Kyle Cherry, Regional Environmental Engineer for the State of Alaska Department of Environmental Conservation.[4]

The total damage award against G & A and ACI amounted to $15,661.25, itemized as follows:

| $10,560 | for destruction of ground vegetation and natural shrubs |
| 1,140 | for destruction of 38 large trees |
| 855 | for destruction of 57 small trees |
| 450 | for restriction on the use of Greenhouse property pursuant to policies of the Greater Anchorage Area Planning Commission |
| 1,156.25 | for business interruptions and future clean-up operations |
| 1,500 | for time spent by Mann Leiser (controlling shareholder and manager of Greenhouse) in attempting to solve the siltation and trespass problems. |

Appellants raise five arguments on this appeal: (1) the court should have turned the case over to the Department of Natural Resources under the doctrine of primary jurisdiction rather than proceeding itself; (2) reasonable use of G & A's land includes siltation, so no injunction should have issued; (3) evidence adduced at trial is insufficient to establish that Greenhouse was harmed by the siltation of Chester Creek; (4) reduction in value of the land was the proper measure of damages rather than cost of restoration; (5) it was error to allow damages for Mann Leiser's lost time.

I

PRIMARY JURISDICTION

Briefly summarized, appellants argue that this case presents a situation that should be handled by the appropriate administrative agency rather than by the courts. Indeed, they observe, the Department of Environmental Conservation, through Kyle Cherry, its Regional Environmental Engineer, has already drafted plans and specifications which appellants have agreed to implement, and "therefore there was no need for court intervention."

The legal theory which forms the touchstone of appellants' argument is founded on the administrative law doctrine of primary jurisdiction. We are instructed by Professor Davis that the doctrine of primary jurisdiction deals with the question of whether a court or an administra-

---

4. Mr. Cherry was called as a witness by both sides, (although he appeared principally on behalf of Greenhouse), testified extensively during the trial, and submitted for introduction into evidence, *inter alia*, a fairly detailed plan covering the specifications for proper drainage ditching.

tive agency should make the initial decision on a given issue. 3 K. Davis, Administrative Law Treatise § 19.01 at 2 (1958). Its purpose is to help a court decide whether it should refrain from exercising its jurisdiction until after the agency has determined some question or an aspect of some question arising in the proceedings before the court.[5] The operational concept underlying the doctrine is the need for an orderly and reasonable coordination of the work of agencies and courts. Whatever the agency's expertise, opines Davis, the court should not act on a subject peculiarly within the agency's specialized field without first taking into account what the agency has to offer. Otherwise, litigants who are subject to the agency's continuous regulation may become victims of uncoordinated and conflicting requirements.

■■ This, of course, is hardly to say that the courts must in each and every case defer to an agency determination. For implicit in the concept of orderly and reasonable coordination is the requirement that the question of deferring to agency expertise be decided with reference to the unique facts of each case.[6] In our opinion, the facts of the instant case militate against resort to the doctrine of primary jurisdiction. The very statute which establishes the Department of Environmental Conservation, AS Title 46, Chapter 3, specifically permits private court actions of the kind instituted by appellee Greenhouse. AS 46.03.870(c) provides:

"This chapter does not estop the state, persons or political subdivisions of the state in the exercise of their rights to suppress nuisances, to seek damages, or to otherwise abate or recover for the effects of pollution or other environmental degradation."

Such actions to suppress nuisances and to recover damages caused therefrom are traditionally cognizable by the courts without reference to agency expertise.[7] The case has progressed through a trial of nearly three weeks duration. The judgment specifically incorporates the terms of the agreement between the principal shareholder of defendants-appellants and the Regional Environmental Engineer of the Department of Environmental Conservation. We are satisfied that the lower court had full advantage of the considerable contribution that the agency could make to the solution of the siltation problem. Accordingly, we reject appellants' request that we reverse and remand the judgment of the lower court under the doctrine of primary jurisdiction.

II

## REASONABLE USE OF APPELLANTS' LAND

Appellants cite us to Weinberg v. Northern Alaska Development Corp., 384 P.2d 450 (Alaska 1963). They read *Weinberg* as standing for the proposition that Alaska has adopted the reasonable use doctrine with respect to a landowner's right to

---

5. *Cf.* Greater Anchorage Area Borough v. City of Anchorage, 504 P.2d 1027, 1032–1033 (Alaska 1972).

6. As the court said in White Lake Improvement Association v. City of Whitehall, 22 Mich.App. 262, 177 N.W.2d 473, 483 (1970) : "In another case it might appear that immediate equitable intervention is necessary, that an administrative proceeding would not give the plaintiff the relief to which he is entitled. Or if the water resources commission refuses to act on a plaintiff's petition seeking relief, or if, before the applica-

bility of the primary jurisdiction doctrine is asserted, judicial proceedings have advanced to a point where it would be unfair to remit the plaintiff to another and duplicative proceeding, a court of equity might well conclude that the proper administration of justice requires it to retain jurisdiction and itself to decide the matter. There are no absolutes, each case must be decided on its own facts. (Footnotes omitted, emphasis added.)

7. W. Prosser, Law of Torts §§ 89, 90 at 591 et seq. (4th ed. 1971).

drain his land of surface waters. Here, they argue, G & A was merely providing the drainage necessary for subdivision development. Its tract naturally drained into Chester Creek. Thus, they conclude, the court could find them liable only by erroneously applying a rule of strict liability rather than reasonable use.

■ As we read *Weinberg*, it lends negligible support to appellants' cause. While this Court indeed adopted the reasonable use doctrine in *Weinberg*, we applied it only to the drainage of "surface waters" and not to the alteration of "watercourses":

> "Plaintiffs contend that the Old Slough [the ditch which defendant corporation filled in thereby causing melting snow to run onto plaintiff Weinberg's land eroding his access road] was a watercourse, in the sense that the term is used to denote water flowing in a definite channel which defendant could not divert without being liable for the resulting injury to plaintiffs. We disagree. The evidence showed that normally water flowed through the slough only during the spring thaw and on infrequent occasions during the summer months when there were heavy rains. Such periodic flow is not of such frequency or duration as to make it practicable to classify the slough as a watercourse. Instead, it must be classified as a drainway for surface waters, i. e., waters from melting snow or rain which flow on the surface of the earth but do not form part of a watercourse." 384 P.2d at 451–452. (Footnotes omitted.)

It seems clear beyond doubt that Chester Creek is a watercourse and not merely a "drainway for surface waters." And at common law,

> "[E]very proprietor upon water flowing in a definite channel so as to constitute a water course has the right to insist that the water shall continue to run as it has been accustomed, and that no one can

change or obstruct its course injuriously to him without being liable to damages." Chicago, R. I. & P. Ry. v. Groves, 20 Okl. 101, 93 P. 755, 759, 22 L.R.A., N.S., 802 (1908), quoted in Weinberg v. Northern Alaska Development Corp., *supra*, at 451, n. 1.

Even if we were to give appellants the benefit of the doubt and to adopt the reasonable use test for the case at bar, it is not a broad license to impose harm on others whatever the circumstances. As we said in *Weinberg*:

> "In determining whether defendant is legally responsible for the damage to the Morgan Way road, we adopt the rule of reasonable use with respect to one's right to drain his land of surface waters. That rule, as stated by the New Jersey Supreme Court, provides 'that each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but *incurs liability when his harmful interference with the flow of surface waters is unreasonable.*'" 384 P.2d 452. (Footnote omitted, emphasis added.)

The question before us in *Weinberg* was whether the defendant constructed the Morgan Way ditch, to accommodate surface waters that previously flowed across his land, in a reasonable manner. 384 P.2d at 452.

■ The evidence adduced at trial on this issue was conflicting, and we ruled that "[i]t was the trial judge's province to resolve the conflict in the evidence." 384 P.2d at 452. Thus even positing a reasonable use test, we read *Weinberg* as standing, *inter alia*, for the proposition that the trial court's ruling on the evidence of reasonableness will be disturbed by this Court only on a showing of clear mistake.

Returning to the case at bar, the lower court specifically found that appellants did not act reasonably in diverting the creek to establish either drainage ditch. All appel-

lants offer in opposition to this finding is their affirmation and belief that they acted reasonably. But appellants directly caused extensive damage to trees and ground cover, as well as erosion of, and sedimentary deposits on, the Greenhouse property. Supporting the court's finding is evidence that construction was undertaken on these drainage ditches before any permit was issued on ACI's application for a water diversion permit. There was no error in the court's finding that appellants acted unreasonably.

### III

### HARM TO GREENHOUSE FROM SILTING OF STREAM

Appellants challenge the sufficiency of the evidence to support the trial court's conclusion that Greenhouse was harmed by the siltation of Chester Creek. They dredge up testimony to the effect that the creek will clear itself in two to five years, underscore Leiser's testimony on cross-examination that Greenhouse is keeping up with its projected pro forma plan for corporate development, and charge that

> "No evidence was ever produced at trial to show that Greenhouse had ever suffered any economic loss or that they were prevented from using the Creek in the normal manner in which they had anticipated using it."

In response, appellee Greenhouse cites us to Graham v. Rockham, 504 P.2d 1351, 1353–1354 (Alaska 1972) wherein this Court reiterated its position on reviewing evidence on appeal:

> " 'One who contends that the evidence is insufficient to support a finding of the trial judge has the task of convincing this court that a definite mistake has been made—that the finding in question is clearly erroneous.'

"Moreover, an appellate court must take the view of the evidence most favorable to the prevailing party below." (Footnotes omitted.)

■ Here the lower court found that appellants' siltation of the stream caused a continuing trespass on Greenhouse property, that Greenhouse will sustain $1,156.25 expense for future cleanup operations attributable to silting caused by appellants and has already sustained $1,500.00 damages for Leiser's lost time spent trying to solve the siltation and trespass problems, and that Greenhouse is entitled to a mandatory injunction because there is no adequate remedy at law. From our reading of the record, we are satisfied that these findings and conclusions are supported by Leiser's testimony and corroborated by Kyle Cherry's testimony.[8]

Appellants having failed to sustain their burden of showing the findings to be clearly erroneous, this argument fails.

### IV

### RESTORATION DAMAGES

■ According to the Restatement of Torts § 929(a) i, a plaintiff who has been injured by an invasion of his land not totally destroying its value may elect as damages either the loss in value or "the cost of restoration which has been or may be reasonably incurred." The lower court awarded Greenhouse $10,560.00 for restoring ground vegetation and natural shrubs in the area of the Graham diversion (a strip 880 feet long x 12 feet wide x $1/square foot restoration cost), $1,140.00 for replacing 38 large trees and $855.00 for replacing 57 small trees.

■ Appellants argue that inasmuch as the land in question is "muskeg and tundra with scrub spruce" it would be impractical

---

8. For example, Leiser testified that he has held back on development of his arboretum because a muddy stream is aesthetically un-

satisfactory and that arboretum showcases tend to bring in big landscape jobs.

and thus unreasonable to require resodding and replanting of spruce. Their analysis commences with an articulation of the distinction between permanent and temporary damages:

> "Only where the cause of the injury to real property is fixed and indeterminable, so that the property must always remain subject to the damages, are the damages permanent, in which case there can be but one recovery. The test whether damages to real estate are permanent or temporary is whether the act producing the injury is productive of all of the damage which can result from the injury, and no further damage can ensue, or whether the injury is intermittent and occasional, or the cause thereof capable of being remedied, removed or abated. In the former case the damages are permanent and in the latter case the damages are temporary." Riddle v. Baltimore & O. R. Co., 137 W.Va. 733, 73 S.E.2d 793, 803 (1952).

As a general rule, only where damages are temporary is restoration an appropriate measure.[9]

At this juncture appellants' argument takes a curious tack. They urge that the damage is permanent and conclude that

diminution in fair market value is thus the appropriate measure.

 The essential questions are (1) whether the injury was temporary and if so, (2) whether the trial court's finding of the amount of damages was reasonable. All we have on the side of permanent injury is appellants' assertion. We cannot reasonably accept their claim that the injury to Greenhouse's land is fixed and irreparable. Surely trees and vegetation will grow there once more. In any case, speculation is unnecessary. Under the evidentiary test of Graham v. Rockman, *supra* at 1385, appellants must convince this Court that the trial judge's findings of fact setting forth the quality, extent and amount of damage are clearly erroneous. This they have failed to do. Accordingly, the award for restoration must stand.

## V

### SPECIFIC DAMAGE AWARDS

Appellants' last argument in this appeal challenges three specific damage awards.

1. *Loss to Greenhouse of Leiser's time.*

 The Court awarded Greenhouse $1,500.00 for 60 hours time spent by Leiser

---

9. *See, e. g.*, 22 Am.Jur.2d, Damages §§ 134, 135:

> "In case of an injury of a permanent nature to real property, the proper measure of damages is the diminution in the market value of the property by reason of that injury, or in other words, the difference between the value of the land before the injury and its value after the injury.
>
> " . . . Most courts agree . . . that when the injuries to the real estate are found to be temporary—or reparable—the diminished market value of the property will not be used as the measure of recovery. The reason for not using diminution of market value appears to be a concern on the part of courts that this would be over-compensating plaintiff—for the plaintiff should not have the decreased value and then be able to repair the damage at a lesser cost.

> "A number of cases have combined the principle of granting the plaintiff damages measured by the cost of repair (providing that this amount is not out of line with the diminution in the market value of the property) with the rule allowing damages for loss of use of the premises during the time the injury continued. This is probably as close to a general rule as the cases can approach. It recognizes two interests of the plaintiff which have been invaded: (1) his interest in having the property in its condition prior to the injury, and (2) his interest in having full use of the property during the time the injury continued. Any general statement will necessarily be modified by the facts of a particular case." 22 Am.Jur.2d at 194, 196, 198 (1965). (Footnotes omitted.)

(at $25/hour) in attempting to solve the siltation and trespass problems. Appellants argue that Greenhouse suffered no loss by virtue of Leiser's lost time, and seek to support their position with the following observations and allegations: (1) Greenhouse's 1971 income was greater than its 1970 income; (2) no one was hired to replace Leiser; (3) there is no evidence to indicate what services were lost or how the corporation was damaged.

Appellee Greenhouse counters with a citation to McCormick on Damages § 42, at 155 (1935):

> While there are decisions to the contrary, the better opinion would seem to be that under the present principle the plaintiff may properly claim as an item of damages the value of his own personal time and services expended in prudent efforts to reduce the loss resulting from defendant's wrongdoing." (Footnote omitted.)

We think the proposition is sound. Leiser is a man who is intimately and uniquely familiar with Greenhouse's needs and the peculiar problems presented by the siltation. To disallow compensation to the plaintiff-corporation on the grounds that no outside employee was hired would in effect sanction wasteful practices. Such a decision would require securing the services of one who by definition could not render comparable services.

Leiser charges out time for his services at $25 per hour. Thus the open market has defined the fair hourly value of his time. All that is required is that Leiser have kept accurate time records. His "conservative estimate" was 100 hours, and the lower court somewhat more conservatively cut this to 60 hours. While we find the lower court's approach to this issue to be somewhat informal, we find nothing erroneous in it.

Briefly to round out the discussion, we fail to see the relevance of comparing Greenhouse's 1970 and 1971 incomes. If Leiser had not had to spend time on this siltation and trespass unpleasantness, he could have benefited the corporation in countless other ways. A proper comparison would ·be between the corporation's 1971 income and the income it would have made (or, *e. g.*, the capital improvements it could have added) had Leiser's time been otherwise spent. In any event, no error having been demonstrated, this award must stand.

### 2. *Restoration cost.*

Appellants observe that Leiser paid merely $4,000/acre for his tract. The court's award of $12,550 for restoring the 10,560 square feet (including replacing the destroyed trees) computes to approximately $50,000/acre. The award, argue appellants, is grossly disproportionate to any loss in value.

■ Inasmuch as appellants have not shown the court's findings of fact underlying this award to be clearly erroneous, this challenge must be dismissed. Leiser's testimony indicated that the principal value of the property was from the creek running through it. His intended use was to enhance the attractiveness of the stream sides, to create a showplace in connection with his nursery business. Thus, computing damages on an acreage basis was, on the facts of this case, irrelevant. ·It was not error to award the reasonable cost of restoring the property to its original condition.

### 3. *Loss of use of land adjacent to diverted stream.*

■ Finally, appellants challenge the $450 allocated for Greenhouse's loss of the use of its land adjacent to the diverted stream. They argue that no evidence supports the finding on which the award is based, and in this instance we think they are correct. The court based its findings

on its perception of "a utilization deprivation to the Plaintiff", but it admitted uncertainty as to the degree of loss and conceded that "there was no direct testimony on—on this subject." Finding no support in the record to sustain this award, we agree with appellants that it cannot stand.

Accordingly, we remand with instructions to decrease the money judgment by $450. In all other respects, the judgment is affirmed.

ERWIN and FITZGERALD, JJ., not participating.

## APPENDIX

SCHEMATIC DIAGRAM

(Not to scale)

Relative location of Greenhouse, G & A, and Carey properties, with approximate flow characteristics of Chester Creek both before and after the stream-diversion projects.