Don DOYLE, Appellant,

v.

Max PEABODY, Appellee.

No. S–2474.

Supreme Court of Alaska.

Oct. 20, 1989.

Rehearing Denied Jan. 8, 1990.

George A. Dickson, Anchorage, for appellant.

Max N. Peabody, Foulds, Felker, Pierson & Ryder, Seattle, Wash., for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This case presents the question whether a landowner who supplies water to his neighbor is precluded from terminating the arrangement or doing so without paying damages. In resolving this question, we examine common-law doctrines concerning licenses, relevant provisions of Alaska's environmental conservation statutes, and the Alaska Water Use Act.

## I. FACTS.

In 1959, Roland Kickbush started construction on a home on what is now Lot 23 of the Tanaina Hills Subdivision in Anchorage. He drilled a well to supply the home with water at a cost of approximately $3,500. In the summer of 1965, Jack Stephl built Don and Marie Doyle a house on adjacent Lot 24. Stephl and Kickbush were business partners in developing the Tanaina Hills Subdivision, but it seems that Stephl alone was the Doyles' grantor. Apparently the pre-construction understanding was that Stephl would build the Doyles a house for about $40,000.

Prior to completion of the house, Kickbush agreed to tap the Doyles into his well. The Doyles agreed to pay Kickbush $12/month for using the well. This arrangement continued until Kickbush sold his house to James McCourt in 1974. Kickbush told McCourt about the water arrangement with Don Doyle (hereinafter "Doyle").[1] McCourt accepted annual payments in the amount of $144 from Doyle until the former moved away in 1981.

In June of 1981 McCourt sold his house to Max Peabody. Apparently McCourt did not tell Peabody of the arrangement to supply water to Doyle. Peabody testified that he became aware of Doyle's use of the well when doing some heating and plumbing work "several months after purchasing the house." In 1982, Peabody's well pump had to be replaced. The well service told Peabody that the cause of the pump's demise was Doyle's ineffective or nonexistent pressure tank. Doyle paid the $981.64 bill for the new pump and had a new pressure tank installed on his own lot at a cost of $328.00. In his brief, Doyle states that Peabody declined the 1982 payment "because Doyle had gone through the expense of well repair." Doyle paid Peabody $144 in 1983 and 1984, and tendered a $144 check in 1985, which Peabody did not cash.

In 1985, Peabody installed a new leach field for his septic system. Peabody's contractor sought a permit from the Municipality of Anchorage for a new leach field, but was refused because septic systems serving more than one residence come within not the Municipality's jurisdiction but the jurisdiction of the State Department of Environmental Conservation (DEC). DEC refused to issue Peabody a permit because his well and septic system were less than 150 feet apart. Peabody then sought a waiver of the 150–foot rule from DEC, which refused his request. By the end of Peabody's third unsuccessful request to DEC, his new, non-complying leach field had been installed.

In the spring of 1986, Peabody put his house up for sale and informed Doyle that he should drill his own well because Peabody intended to cut off Doyle's water supply in order to sell his house. By transforming his well from one serving two single-family dwellings to a well serving only one single-family dwelling, jurisdiction over the sewage system would be transferred from DEC to the Municipality. The system complied with the Municipality's regulations.

---

**1.** Marie is not a party to this appeal. Don and Marie had separated and divorced around this time.

Peabody found a buyer for his house. Doyle asked Peabody to pay 50 percent of the cost of a new well; Peabody refused. On July 3, Peabody wrote Doyle to warn that he would have "no choice but to close the line running between [his] well and [Doyle's] house [by July 23] in order to insure that [he] obtain Municipal approval for [his] water system". On July 24, 1986, Peabody cut off Doyle's water supply. On July 25, 1986, Doyle filed a lis pendens and complaint for injunctive relief and damages. In August 1986, Doyle installed a well on his property at a cost of $6,974.50.

A year later, in July 1987, the dispute proceeded to trial. On May 7, 1987, just prior to the trial-setting conference, Peabody offered to settle on a walk-away basis; Doyle refused. After a two-day bench trial, the superior court decided in favor of Peabody on the basis that the 1965 agreement was not intended to be irrevocable. The superior court subsequently awarded Peabody $1,063.29 in costs and $7,000.00 in attorney's fees. This appeal followed.

## II. DISCUSSION.

Doyle alleges statutory causes of action under AS 46.03 and AS 46.15, and a common-law cause of action based on an irrevocable license. *See also* note 6. The statutes cited by Doyle were discussed at trial, but the superior court did not mention them in its Findings of Fact and Conclusions of Law. Doyle's attorney objected in writing to their omission.

### A. *Doyle Has No Private Cause of Action for Damages Under AS 46.03.*

■ Doyle's first statutory cause of action relies on Peabody's alleged violation of the first sentence of 18 AAC 80.100(a), which states:

No person may construct, install, *alter*, renovate, or improve a public water system, or any part of one, without written approval of engineering plans submitted to the department under this section.

(Emphasis supplied.) Peabody was operating a "public water system," which is defined in 18 AAC 80.900(22) as

any source of water, intake works, collection system, treatment works, storage facility, or distribution system from which water is available for human consumption; the term includes, but is not limited to, *systems providing water to more than one residential dwelling unit,* ... but does not include a system serving only a single-family residence. (Emphasis supplied.)

AS 46.03.790 makes violations of 18 AAC 80.100 a class B misdemeanor if the violation is negligently committed, and a class A misdemeanor if knowingly committed. The state can obtain civil damages for violations under AS 46.03.760. AS 46.03.870, titled "Actionable rights," states in full:

(a) Except as specified in AS 46.03.822—46.03.828 [relating to strict liability for the discharge of hazardous substances], the bases for proceedings or actions resulting from violations of this chapter or a regulation adopted under this chapter inure solely to and are for the benefit of the state, and are not intended in any way [to] create new or enlarge existing rights of persons or groups of persons in the state.

(b) Except as specified in AS 46.03.822—46.03.828, a determination or order of the department does not create a presumption of law or finding of fact inuring to or for the benefit of persons other than the state.

(c) This chapter does not estop the state, persons, or political subdivisions of the state in the exercise of their rights to suppress nuisances, to seek damages, or to otherwise abate or recover for the effects of pollution or other environmental degradation.

We conclude that subsection (a) is dispositive. Doyle cannot recover damages simply on the basis of a violation of 18 AAC 80.100, but can seek to "recover for the effects of pollution or other environmental degradation" under subsection (c) under existing common-law theories. However, Doyle has not alleged that his land has suffered pollution or environmental degradation, or that he has suffered any compensable damages as a result of pollution or

environmental degradation. Therefore, even in a negligence action, Doyle could not rely on 18 AAC 80.100 as the applicable standard of care because the regulation was not designed to prevent the harm alleged, that is, the incidental and consequential damages flowing from being cut off from one's water supply. *See Lundquist v. Department of Pub. Safety*, 674 P.2d 780, 782 (Alaska 1983).

B. *Doyle Has No Private Cause of Action for Damages Under the Alaska Water Use Act.*

The Alaska Water Use Act, AS 46.15.-010–.270, governs the appropriation and distribution of water rights in Alaska. *See* AS 46.15.010. Appropriation is defined as "the diversion, impounding or withdrawal of a quantity of water from a source of water for a beneficial use or the reservation of water under AS 46.15.145." AS 46.15.260(2).

Doyle argues that he had an existing water appropriation which Peabody unlawfully terminated on July 24, 1986. Peabody argues that even if Doyle had a valid appropriation in 1965 under AS 46.15.060,[2] that appropriation was extinguished on July 31, 1967, by operation of 11 AAC 93.020[3] (promulgated pursuant to AS 46.-15.065(b)(1))[4] because Doyle did not file a claim for that right by July 31, 1967. Although 11 AAC 93.020 (which was not adopted until 1979) purports to extinguish

---

2. Alaska Statute 46.15.060 provides:
 *Existing rights.* A water right acquired by law before July 1, 1966 or a beneficial use of water on July 1, 1966, or made within five years before July 1, 1966, or made in conjunction with works under construction on July 1, 1966, under a lawful common law or customary appropriation or use, is a lawful appropriation under this chapter. The appropriation is subject to applicable provisions of this chapter and regulations adopted under this chapter.

3. 11 AAC 93.020 provides, in relevant part: "A claim to an existing right is extinguished unless the claim was filed by ... (3) July 31, 1967, for the Anchorage, Palmer, and Whittier Recording Districts...."

4. Alaska Statute 46.15.065(a) (formerly AS 46.-15.135(a)), titled "Determination of existing rights," requires claimants of an existing water

---

existing water rights if a declaration of rights is not filed by the appropriate date in 1967 or 1968, AS 46.15.065 does not explicitly state the effect of a failure to file. *Compare* Trelease, *Alaska's New Water Use Act,* 2 Land & Water L.Rev. 1, 34 (1967) (suggesting the desirability of concluding that a failure to file results in the loss of rights) *with* F. Trelease, *A Water Code for Alaska: A Report to the State of Alaska* 61 (Jan. 12, 1962) (suggesting that forfeiture for failure to file is probably neither necessary nor desirable in Alaska).

 We need not decide this issue because disputes concerning water rights are to be adjudicated by the Department of Natural Resources (DNR) under AS 46.15.-010. Doyle has never filed a permit or appropriation application with DNR to establish his rights in the water from the Kickbush–Peabody well. If he had done so, or if he had asserted a continuing right to water from the well, the appropriate remedy would be to remand the dispute to the DNR Commissioner under AS 46.15.-168(b)[5] so that available administrative procedures might be exhausted. *See Standard Alaska Prod. Co. v. State, Dep't of Revenue,* 773 P.2d 201, 206 (Alaska 1989). The Water Use Act does not create any public or private damage remedy for interference with existing appropriations.[6] The Act does provide criminal penalties for cer-

---

right under AS 46.15.060 to file a declaration of appropriation. 11 AAC 93.020.

5. AS 46.15.168(b) states: "The commissioner may accept a remand from a state or federal court of a water rights dispute and may administratively adjudicate the dispute under AS 46.-15.165."

6. In *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.,* 517 P.2d 1379 (Alaska 1974), cited by Doyle, this court mentioned AS 46.15.180 in a footnote. *Id.* at 1381 n. 3. In deciding a suit by a downstream property owner against two upstream property owners for, *inter alia,* damages, the court relied on common-law causes of action, and not the Water Use Act. *See id.* at 1383–88.

tain actions. AS 46.15.180.[7]

### C. Doyle's Claim of an Irrevocable License.

■ The superior court found that "[t]he license given to Don and Marie Doyle by Roland Kickbush to use water from the well located on Lot 23 for their residence was a revocable license." Doyle claims that the license was irrevocable because he purchased the house in reliance upon a permanent supply of water.

We agree with the superior court:

[A] license for the use of land is revocable, both at law and in equity, whether the license is or is not executed by the expenditure of money by the licensee; and ... the latter, upon the revocation of the license can claim compensation for expenditures made by him on the faith of the license, as against the original licensor only.

*Mayor and City Council of Baltimore v. Brack*, 175 Md. 615, 3 A.2d 471, 475 (1939).[8] Thus, whatever expenditures Doyle incurred in reliance on the license granted by Kickbush cannot be recovered from Peabody.

Because Peabody purchased his property without notice that Doyle was taking water from the Kickbush–Peabody well, any license possessed by Doyle to take water from the well did not survive the 1981 conveyance from McCourt to Peabody. *See City of Anchorage v. Nesbett*, 530 P.2d 1324, 1329–30 (Alaska 1975) (license generally revocable by alienation of servient estate). Thus, any legal right possessed by Doyle to take water from Peabody's well must have been granted by Peabody.

■ Assuming that Peabody granted Doyle a license to take water from his well between 1982 (when Peabody learned that Doyle was taking water from his well and

charged Doyle for a new pump) and 1986 in exchange for $144/year, Peabody nevertheless had the right to revoke this license in 1986. As a consequence of this revocation, Doyle can claim compensation for expenditures made by him in reliance upon the license to the extent that the value of such expenditures had not yet been realized and was lost by the termination of the license.

Thus, under this scenario, Doyle cannot recover the cost of his new well because this expenditure was not made in reliance upon the license granted by Peabody, but rather was made after and as a result of the revocation of the license. Given that the installation of a well on Doyle's property has probably appreciated its value, this result equitably deprives Doyle of a possible windfall. Nor, under this scenario, can Doyle recover the $144 payments he made to Peabody in 1983 and 1984, as these payments were the *quid pro quo* for the water Doyle used for two years.

Thus, the only possible qualifying expenditures made by Doyle are the $981.64 he expended in 1982 for a new pump for Peabody's well, and the $328 he expended in the same year for a new pressure tank as part of his own water system. Assuming that Doyle is not equitably estopped from seeking to recover the cost of the new pump on the basis that the need for it was attributable to him, Doyle may recover the cost of this expense, less an appropriate deduction for four years' use of the pump. Doyle may similarly recover the costs of the new pressure tank (less an appropriate reduction for four years' use) if the pressure tank was rendered useless by the revocation of the license. If, however, the pressure tank could be utilized by Doyle in his new water system, then he is not entitled to any recovery for this expense because, in this case, the revocation of the

---

7. In light of our resolution of this issue, we need not address Peabody's contention that a cause of action under this statute was not properly pled.

8. *See also* R. Cunningham, W. Stoebuck & D. Whitman, *The Law of Property* § 8.1, at 437, § 8.8, at 456–58 (1984); 3 R. Powell & P. Rohan, *The Law of Real Property* ¶¶ 427–429 (1987); 3 H. Tiffany & B. Jones, *The Law of Real Property*

§§ 829–838 (1939 & Supp.1989); Singer, *The Reliance Interest in Property*, 40 Stan.L.Rev. 611, 670–72 (1988); Conard, *Unwritten Agreements for the Use of Land*, 14 Rocky Mtn.L.Rev. 294 (1942); Annotation, *Right of Licensee for Use of Real Property to Compensation for Expenditures Upon Revocation of License*, 120 A.L.R. 549 (1939).

license did not deprive him of the value of his expenditures.

In addition, we think it equitable that any recovery by Doyle for the lost value of expenditures be reduced by any amounts owed to Peabody for water used by Doyle from 1984 to 1986. Should these amounts exceed Doyle's damages, however, Peabody is not entitled to an affirmative recovery because he never sought them.

Therefore, we remand this issue to the superior court to determine whether Peabody granted Doyle a license to take water from his well, and if so, the amount of damages, if any, to which Doyle is entitled as a result of Peabody's revocation of the license.

### D. *Attorney's Fees.*

Although our remand on the main issue of this case dictates setting aside the superior court's award of attorney's fees, we will nevertheless address Doyle's claims of error with regard to the superior court's award in order to assist the court in making a proper award on remand.

1. *The Superior Court Erred in Augmenting Its Award Based on Plaintiff's Failure to Accept a Pre-Trial Settlement Offer.*

■ Doyle appeals the superior court's increase of partial attorney's fees from 50 percent of actual fees to 70 percent of actual fees based on his "exceptional degree of litigious tenacity." The court based its view on Doyle's refusal to accept Peabody's settlement offer prior to trial:

Although no bad faith litigation is attributed to plaintiff, in the Court's view plaintiff's case was disastrously weak on both the law and the evidence. Setting aside the former, since a rule of law can always be debated, the facts certainly had to have been known to plaintiff. Foreseeing what his own testimony and the testimony of the neighborhood would amount to, plaintiff's failure to settle with the defendant on an "each walk away" basis seems extremely ill-advised. Reluctantly the Court concludes that plaintiff pressed this suit, which at one

time he would have settled for less than one-sixth the total attorney's bill (by the Court's estimate), in the face of a determined adversary who did not conceal the strengths of his case.

In so doing the Court believes plaintiff demonstrated that exceptional degree of litigious tenacity which justifies an augmented fee award above that which partially compensates the prevailing party. The Court awards 50% of actual fees as partial compensation, augmenting the award to a total of 70%.

Our recent decisions in *Myers v. Snow White Cleaners & Linen Supply,* 770 P.2d 750, 752–53 (Alaska 1989), and *Day v. Moore,* 771 P.2d 436, 438–39 (Alaska 1989), counsel that Civil Rule 68 is the exclusive mechanism for penalizing a party for its failure to accept a pre-trial settlement offer. Thus, the superior court erred in taking past settlement negotiations into account in making an award under Civil Rule 82.

2. *The Superior Court Did Not Abuse Its Discretion in Taking into Account Peabody's Legal Services.*

■ Doyle also appeals the superior court's award of attorney's fees based on the court's failure to consider the segregation rule of *Sherry v. Sherry,* 622 P.2d 960 (Alaska 1981). In essence, Doyle is attacking the court's grant of attorney's fees based on Peabody's services as an attorney, which the court valued at $7,500:

Further the Court concludes that the 75 hours defendant claims as counsel in his own behalf are accurately characterized as attorney activity, and not activity appropriate only as to a party witness. Defendant is entitled to a fee award based in part upon those hours. Applying a conservative figure of $100 per hour and adding the Shimek bill produces a total attorney fee in excess of $10,000.

In *Sherry* this court stated:

We therefore conclude that if the court wished to award attorney's fees for Alan's time it should have done so only after making a clear segregation of his compensable time, expended as an attor-

ney active in the litigation, and his non-compensable time, expended as client. 622 P.2d at 966 (footnote omitted).

Doyle's argument that the superior court failed to abide by our decision in *Sherry* is without merit. The superior court properly segregated compensable from noncompensable time. He based this segregation on Peabody's Memorandum in Support of Attorney's Fees, which states in part:

[D]efendant himself expended in excess of 75 hours rendering legal services on his own behalf. This time included, but is not limited to:

(a) taking the deposition of Roland Kickbush;

(b) preparing interrogatories and request for production to be answered by defendant;

(c) answering interrogatories and request for production propounded by plaintiff;

(d) filing a motion to set the case for trial with accompanying witness and exhibit lists;

(e) doing the legal research necessary for and preparing and filing a motion for summary judgment and all memoranda thereto;

(f) contacting witnesses prior to trial and arranging for their presence at trial; and

(g) preparing a trial brief and otherwise preparing for and participating in the conduct of the two day trial.

The above estimate of hours spent providing legal services does not include hours which might more appropriately be considered to be hours necessarily spent by defendant in his capacity as a party to this action. That is, no requests for attorney's fees [are] being made for that time which defendant necessarily spent as a witness at trial or otherwise acting in his capacity as a party defendant.

3. *The Superior Court Did Not Err in Failing to Consider Peabody's Apparently Abandoned Counterclaim.*

█ In his amended answer, Peabody posited a counterclaim, the essence of which is contained in the following paragraphs:

7. On July 25, 1986 the plaintiff caused a lis pendens to be filed against the defendant's property.

8. This action by plaintiff at a time when plaintiff knew of defendant's contract of sale of his property to a third person, knew of the difficult real estate market in Anchorage at that time, and knew that defendant had left the state, was wrongful and an attempt to interfere with the defendant's beneficial contractual rights with third persons and to coerce the defendant to pay for the cost of drilling a well on plaintiff's property for plaintiff's use.

9. This action was accomplished maliciously and wrongfully for an improper purpose and constitutes an actionable interference with contract.

10. As a proximate result of plaintiff's wrongful actions, defendant has sustained damages in an amount to be proven at trial, including but not limited to the engineering and construction costs incurred in removing plaintiff's access to defendant's well, increased closing costs related to the sale of defendant's house, increased travel cost incurred by defendant in order to accomplish closing of the sale and other damages related thereto.

11. In view of the intentional and malicious nature of plaintiff's actions, defendant is entitled to recovery of punitive damages against plaintiff.

On July 2, 1987, Doyle's attorney filed a motion to dismiss Peabody's counterclaim. We assume that the motion was deemed denied because we can find no order of the court dismissing it in the record.

Doyle claims on appeal that the superior court failed to consider that he had "prevailed" on the counterclaim. However, the counterclaim was not litigated at trial and was presumably abandoned. Therefore, the superior court did not abuse its discretion in not taking into account the counterclaim in making its attorney's fees award.

REVERSED and REMANDED to the superior court for further proceedings consistent with this opinion.