**LANCASTER v. N.C. DEP'T OF ENV'T & NATURAL RES.**

[187 N.C. App. 105 (2007)]

A.J. LANCASTER, JR., Petitioner v. NORTH CAROLINA DEPARTMENT OF ENVI-
RONMENT AND NATURAL RESOURCES, DIVISION OF WASTE MANAGEMENT,
AND ENVIRONMENTAL MANAGEMENT COMMISSION, Respondents

No. COA07-149

(Filed 6 November 2007)

### 1. Collateral Estoppel and Res Judicata— date of petroleum release—final agency decision unreversed

Although respondent DEHR contends in an action seeking reimbursement from the Trust Fund for the removal of underground storage tanks (USTs) that the suspected petroleum release had not happened in 1989 or 1991, the trial court did not err by concluding that it was bound by the finding in the 2001 final agency decision under the doctrine of collateral estoppel and that the parties were bound by this finding, because: (1) collateral estoppel precludes relitigation of an issue decided previously in judicial or administration proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding; (2) when a fact has been agreed upon or decided in a court of record, neither of the parties shall be allowed to call it in question and have it tried over again at any time thereafter so long as the judgment or decree stands unreversed; and (3) the 2001 final agency decision stands unreversed.  ·

### 2. Environmental Law— underground storage tanks—statutory owner—innocent landowner exception

The trial court did not err by failing to find that petitioner was the statutory owner of the underground storage tanks (USTs) and, as such, was responsible for submitting a Comprehensive Site Assessment (CSA) report, nor by applying the innocent landowner exception, because: (1) only responsible parties who conduct and control the activity leading to the discharge must file a CSA; (2) the Court of Appeals was bound by the finding that the only discharges on petitioner's land occurred in 1989 and 1991 before petitioner inherited the property from his father; (3) petitioner cannot be a responsible party under 15A NCAC 2L .0115(f) or a person conducting or controlling the discharge under 15A NCAC 2L .0106(c) when the discharges occurred before he acquired the property; and (4) although respondents made much of petitioner's property being on the state's top Ten Worst UST

Discharges list, petitioner was hardly the only party to blame for the detrimental impact of the discharge when DENR did not notify petitioner of the 1989 and 1991 contamination until 1998 in response to petitioner's application for coverage under the Trust Fund.

Appeal by respondents from judgment entered 13 October 2006 by Judge Quentin T. Sumner in Nash County Superior Court. Heard in the Court of Appeals 12 September 2007.

*Simonsen Law Firm, P.C., by Lars P. Simonsen, for petitioner.*

*Attorney General Roy Cooper, by Assistant Attorney General Kelly L. Sandling, for respondents.*

ELMORE, Judge.

The North Carolina Department of Environmental and Natural Resources (DENR), the Division of Waste Management, and the Environmental Management Commission (the EMC) (collectively, respondents) appeal a 13 November 2006 judgment filed in Nash County Superior Court. The judgment reversed a final agency decision by the EMC assessing A.J. Lancaster, Jr. (petitioner), a civil penalty and costs of $7,563.38 for failing to submit a Comprehensive Site Assessment (CSA) report as required by 15A NCAC 2L.0115(f).

Background

Petitioner inherited property from his father, A.J. Lancaster, Sr. (Lancaster, Sr.), who owned and operated underground storage tanks (USTs) on the property prior to his death in November of 1991. It appears that Lancaster, Sr., asked the Nash County Health Department to test his well water, and that the tests revealed high levels of benzene and other gasoline constituents. Nash County reported these findings to DENR,[1] which performed laboratory analysis of the groundwater sample taken by Nash County. DENR re-sampled the well in January of 1991 and again found gasoline constituents in the water. DENR notified Lancaster, Sr., by letter dated 15 February 1991, which included the following language:

On February 14, 1991, the Raleigh Regional Office received a report of laboratory results of the sampling of your well on January 31, 1991. According to the lab report, methyl tertbutyl

---

1. DENR has gone through several incarnations and name changes during the course of these events. For ease of reference, we refer to all of them as DENR.

ether was found in your water. This compound which is a common gasoline additive indicates a release of a regulated substance has occurred from the underground storage tanks on your facility.

Based on the information submitted, the Division has reason to believe a regulated substance may have or is continuing to be released. Pursuant to [2N .0603], the Division is requiring you to determine if the underground storage tanks at this facility are the source of contamination. If a release is discovered, then you must immediately begin release response and corrective action as required in Section .0700.

The report required under release investigation and confirmation as described in Subsection .0603 is due in this office within seven (7) days of receipt of this letter. . . . Failure to submit this report within the time limits or request an extension before the deadline is a violation of State regulations and the Division may hold you liable for a civil penalty of not more than $10,000 for each day of continued noncompliance in accordance with G.S. 143-215.6.

Lancaster, Sr., did not respond to DENR's letter—either to ensure the safety of his well water or to comply with DENR's demands.

Petitioner was appointed executor to his father's estate and, as executor, published a Notice to Creditors pursuant to Chapter 28A of our General Statutes. Respondents made no claim against the estate. DENR continued to send Annual Tank Operating fee invoices to Lancaster, Sr., which petitioner paid. In 1993, DENR sent a notice that the USTs were subject to new technical requirements and needed to be upgraded or closed. Petitioner investigated the cost of the upgrades and decided to close the tanks. He contacted DENR about this decision and DENR informed him that this was a good time to close the tanks because he would qualify for the lowest deductible under the Leaking Petroleum Underground Storage Tank Cleanup Fund (the Trust Fund) if the tanks were closed prior to 1 January 1994 and contamination was discovered. DENR did not mention the contamination found in 1989 and 1991 or the belief expressed in the 1991 letter that the USTs were leaking and causing the contamination.

Petitioner hired an environmental consultant to remove the USTs on 29-30 December 1993. Soil and groundwater samples revealed petroleum contamination, which was reported to DENR. Petitioner excavated and properly disposed of 225 cubic yards of contaminated soil from the tank area.

In response to petitioner's tank closure report, DENR sent petitioner a Notice of Regulatory Requirements (NORR) on 5 July 1994, which stated, "Information received by this office on February 1, 1994 relative to a suspected petroleum release, does confirm a release from an underground storage tank system located at A.J. Lancaster Store . . . ." The NORR informed petitioner that as the owner of the USTs, he "must comply with the release requirements of the State's rules," 15A NCAC 2N .0700, a copy of which was attached to the NORR. The letter contained summaries of several rules including 15A NCAC 2N .0706, which requires that

> [i]f certain conditions exist as described in the rule . . . the owner and operator [must] conduct a comprehensive site assessment (CSA) of the release area to determine the full horizontal and vertical extent of any soil and groundwater contamination caused by the release from its UST system. A copy of the guidelines titled, "Groundwater Section Guidelines For The Investigation and Remediation of Soils and Groundwater" addressing the requirements for submittal of the CSA can be obtained at the [Raleigh Regional Office (RRO)]. . . . A complete report of the required investigation must be submitted to the RRO no later than **October 7, 1994**.

The NORR did not specify what conditions would necessitate a CSA, nor did it specify that such conditions existed in this case. There is no evidence that petitioner requested a copy of the CSA guidelines or that he received one.

According to a Record of Communication made by a DENR staff member, petitioner contacted DENR by telephone on 10 April 1996 to "find out what would be required for this site." Petitioner was told that DENR "had no record of receiving a CSA and that one is required whenever soil contamination exceeds the concentration determined by an SSE."

The next preserved communication from DENR to petitioner is a Notice of Violation (NOV) dated 17 May 1996, which stated that the 5 July 1994 NORR "required per 15 A NCAC 2N .0706, that [petitioner] submit a Comprehensive Site Assessment (CSA) on or before October 7, 1994." According to this NOV, petitioner's 10 April 1996 telephone call followed a 20 March 1996 NOV, which requested that petitioner submit a CSA.[2] The NOV further stated that "[a]s a result of [his] failure to submit a CSA, [petitioner is] formally considered to be in con-

---

2. This March NOV is not in the record.

tinuous violation of 15A NCAC 2N .0706 and 15A NCAC 2L .0106 since October 7, 1994."

Petitioner submitted a handwritten CSA on 24 June 1996, which DENR rejected as incomplete and not in compliance with the reporting requirements of 15A NCAC 2L .0106 and .0111. Specifically, petitioner's handwritten CSA did not include analysis performed by a North Carolina Licensed Geologist or a qualified Professional Engineer or a seal from one of those specialists.

DENR sent a Recommendation for Enforcement Action letter to petitioner on 14 November 1997, advising petitioner that the RRO was "preparing a recommendation for enforcement action to the Director of the Division of Water Quality" because of petitioner's "failure to comply with the reporting requirements of . . . 15A . . . 2N .0706 and 2L .0106 as indicated in the" 17 May 1996 NOV. The letter continues:

> By letter dated November 20, 1996, you were given an opportunity to provide an explanation for the above referenced violations. Based on your response to that letter, it appears that at least two of the previous notifications from the Division were sent to your father (A.J. Lancaster, Sr.).[3] However, as the executor of your father's estate and current property owner, we consider both you and the Estate of A.J. Lancaster, Sr. to be responsible parties and therefore jointly and severally liable for the contamination at this site."

DENR sent another NOV on 14 November 1997, which included the following language:

> By letter dated July 24, 1997, your attorney (Lars Simonsen) indicated that you inherited the property containing the USTs from the Estate of A.J. Lancaster, Sr. After the operation of the USTs was discontinued on December 28, 1993. While it is claimed that you never individually operated the USTs, it appears that you were the executor of the estate and had a responsibility to comply with the notices that had been issued to both you and your father. Based on this information and the fact the USTs remained in use after November 8, 1984, we believe that both you (A.J. Lancaster, Jr.) and the Estate of A.J. Lancaster, Sr. are statutory owners of the USTs. Furthermore, we continue to believe

---

3. Photocopies of the letters and envelopes show that the envelopes were addressed to A.J. Lancaster, Sr., but that the letters were addressed to A.J. Lancaster, Jr. Petitioner's signature appears on the return receipts.

that you and the Estate of A.J. Lancaster, Sr. Are responsible parties and are jointly and severally liable for the contamination at this site.

Notwithstanding these issues, you are the landowner of record and we consider you to also have responsibility as the person in control of the release. In accordance with 15A NCAC 2L .0106, any person conducting or controlling an activity which results in a discharge to the groundwater must take immediate action to terminate and control the discharge and to mitigate any hazards resulting from the discharge. As the person in control of the release, you are responsible for conducting a site assessment (CSA) sufficient to determine the full vertical and horizontal extent of the contamination . . . .

This office has sent numerous letters to you outlining the requirements and explaining what is required to comply with state regulations. However, to date, you have failed to make any reasonable efforts toward achieving compliance. *Your failure to act in a timely manner has caused the contamination to migrate off-site* and impact at least two other drinking water wells.

(Emphasis added). These NOVs continued until 2003.

The 2001 Final Agency Decision

[1] Petitioner sought reimbursement for the removal of the USTs from the Trust Fund. *See* N.C. Gen. Stat. § 143-215.94B (2005) (describing the Trust Fund). The Trust Fund will reimburse the cost of "the cleanup of environmental damage . . . in excess of twenty thousand dollars ($20,000) per occurrence" "resulting from a discharge or release of a petroleum product from a commercial underground storage tank . . . discovered on or after 1 January 1992 and reported between 1 January 1992 and 31 December 1993 inclusive." N.C. Gen. Stat. § 143-215.94B(b) (2005). The Trust Fund will reimburse the cost of cleanup in excess of $50,000.00 "[f]or discharges or releases discovered or reported between 30 June 1988 and 31 December 1991 inclusive." *Id.* Petitioner sought a $20,000.00 deductible for the removal of the USTs because the tanks were removed in December of 1993, but DENR argued that petitioner was only entitled to a $50,000.00 deductible because the discharge had been discovered in 1989 and 1991.

An administrative law judge (ALJ) concluded that "a discovered release as defined in 15A NCAC 2P.0202(b)(4) existed at the

Lancaster Store Site in both 1989 and 1991 when the on-site water supply well sample confirmed petroleum contamination in the form of benzene contamination and MTBE contamination." The ALJ's recommended decision was adopted as DENR's final agency decision on 6 March 2001 (the 2001 final agency decision). Petitioner appealed to the superior court, but before a verdict was reached, the parties entered into a settlement agreement that allowed petitioner to pay the $20,000.00 deductible rather than the $50,000.00 deductible, but did "not resolve any other issues except for the specific deductible issue."

During the trial for the case at bar, DENR argued that the release had not happened in 1989 or 1991, despite the agency's own final decision finding that fact. The superior court judge correctly stated at trial that he was bound by the finding in the 2001 final agency decision under the doctrine of collateral estoppel. "Collateral estoppel precludes relitigation of an issue decided previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding." *Bradley v. Hidden Valley Transp., Inc.*, 148 N.C. App. 163, 166, 557 S.E.2d 610, 613 (2001) (citations and quotations omitted). "[W]hen a fact has been agreed upon or decided in a court of record, neither of the parties shall be allowed to call it in question, and have it tried over again at any time thereafter, so long as the judgment or decree stands unreversed." *State v. Summers*, 351 N.C. 620, 623, 528 S.E.2d 17, 20 (2000) (citation and quotations omitted) (alteration in original). The 2001 final agency decision stands unreversed and therefore the parties and this Court are bound by that decision's finding that the releases on petitioner's property occurred in 1989 and 1991.

The 2006 Final Agency Decision

DENR pursued enforcement against petitioner because petitioner was in violation of "15A NCAC 2L .0115(f) from 30 August 2003 through at least 16 June 2004 by failing to submit a [CSA] for prior release or discharge from petroleum underground storage tanks formerly located at the A.J. Lancaster Store . . . ." The 20 January 2006 final agency decision (the 2006 final agency decision) made the following relevant conclusions of law:

13. The Petitioner violated 15A NCAC 2L .0115(f) by failing to submit a [CSA] from August 30, 2003 through at least June 16,

2004 in accordance with the procedures and requirements of the cited rule.

15. Petitioner would be absolved of liability for contamination occurring at the site prior to 1991 under the innocent landowner exception pursuant to 15A NCAC 2L .0101(b) since evidence presented at trial by Petitioner indicated he had no knowledge of releases occurring in 1989 and 1991.

16. Petitioner's liability as an owner of the USTs under 15A NCAC 2n .0203 exists since he inherited the tanks from his father in 1991 and the tanks held a regulated substance.

18. The assessment of civil penalties was unnecessarily harsh, given that Mr. Lancaster's claim of being an innocent landowner had some merit, that he did make efforts to comply, and that he never operated the USTs.

The final agency decision reduced the amount of petitioner's fine to $7,563.38.

Petitioner appealed the 2006 final agency decision to the superior court, which reversed. The order is brief and includes as its sole legal basis for the reversal:

that Respondents' conclusion of law that Petitioner is not absolved of liability under the innocent landowner exception pursuant to title 15A N.C.A.C. 2L.0101(b) is an error of law. Applying the *de novo* standard, the Court finds as a fact and as a matter of law that Petitioner is absolved of liability under title 15A N.C.A.C. 2L.0101(b) on the grounds that Petitioner acquired the property by inheritance without knowledge or a reasonable basis for knowing that groundwater contamination at the Lancaster Store site had occurred.

Discussion

[2] Respondents argue that the trial court erred by failing to find that petitioner was the statutory owner of the USTs and, as such, was responsible for submitting a CSA report. They also argue that the trial court erred by applying the innocent landowner exception. We disagree.

DENR fined petitioner for violation of 15A NCAC 2L .0115(f) (2005),[4] which states, in relevant part:

---

4. 15A NCAC 2L .0115(f) was recodified at 15A NCAC 2L .0400 effective 1 December 2005.

LANCASTER v. N.C. DEP'T OF ENV'T & NATURAL RES.

[187 N.C. App. 105 (2007)]

> If the risk posed by a discharge or release is determined by the Department to be high risk, *the responsible party* shall comply with the assessment and cleanup requirements of Rule .0106(c), (g) and (h) of this Subchapter and 15A NCAC 2N .0706 and .0707.

15A NCAC 2L .0115(f) (2005) (emphasis added). DENR had determined that the discharge on petitioner's property was high risk, thus triggering compliance by "the responsible party." 15A NCAC 2L .0106(c)(2) requires that "[a]ny person *conducting or controlling* an activity which has not been permitted by the Division *and which results in an increase* in the concentration of a substance in excess of the standard . . . shall . . . submit a report to the Director assessing the cause, significance and extent of the violation . . . ." 15A NCAC 2L .0106(c) (2005) (emphasis added). Rules .0106(g) and (h) of Subsection L list further required content for the site assessment—or CSA—described in Rule .0106(c). 15A NCAC 2L .0106(g)-(h) (2005). Therefore, petitioner's duty to file a CSA hinges on his being "the responsible party" for the discharge and a "person conducting or controlling an activity . . . which results in an increase" in a regulated substance. 15A NCAC 2L .0106(c) (2005).

The Authorization subsection of Subchapter 2L states, in relevant part:

> (b) These rules are applicable to all activities or actions, intentional or accidental, which contribute to the degradation of groundwater quality . . . *except an innocent landowner* who is a bona fide purchaser of property which contains a source of groundwater contamination, who purchased such property without knowledge or a reasonable basis for knowing that groundwater contamination had occurred, or a person whose interest or ownership in the property is based or derived from a security interest in the property, *shall not be considered a responsible party.*

15A NCAC 2L .0101(b) (2006) (emphasis added).

The trial court found that petitioner was an innocent landowner and thereby absolved of liability because he "acquired the property by inheritance without knowledge or a reasonable basis for knowing that groundwater contamination at the Lancaster Store site had occurred." In the 2006 final agency decision, the EMC concluded, as a matter of law, that "Petitioner would be absolved of liability for contamination occurring at the site prior to 1991 under the innocent

landowner exception pursuant to 15A NCAC 2L .0101(b) since evidence presented at trial by Petitioner indicated he had no knowledge of releases occurring in 1989 and 1991."

Although the innocent landowner exception in Rule .0101(b) does not specifically include language protecting a landowner who inherits contaminated property, the EMC itself recognized that the exception's purpose—to protect from prosecution those landowners who acquire property without prior knowledge of contamination—applies to landowners who acquire land by inheritance. Petitioner inherited the property "without knowledge or a reasonable basis for knowing that groundwater contamination had occurred." 15A NCAC 2L .0101(b) (2006). The EMC specifically did not find liability for the discharges that occurred before petitioner acquired the property.

The EMC instead concluded that petitioner's liability arose because he owned the USTs after he inherited the property from his father in 1991, and that the tanks were "in use" until their removal in 1994. The EMC concluded that this made petitioner an "owner" under 15A NCAC 2N .203, and that as an "owner," he must "comply with . . . the Comprehensive Site Assessment report requirements of 15A NCAC 2L .0115(f)." 15A NCAC 2L .0115(f), which is the basis for petitioner's fine, does not state that it applies to "owners" of USTs. It states that it applies to "responsible parties" and makes no reference to "owners" as defined in Subsection 2N. 15A NCAC 2L .0115(f) (2005). Furthermore, the CSA requirement itself arises from 2L .0106(c), which applies to persons "conducting or controlling" discharge without reference to "owners" or Subsection 2N.

The issue before us is whether petitioner violated 15A NCAC 2L .0115(f) by failing to file a CSA. We are bound by the finding in the 2001 final agency decision that the only discharges on petitioner's land occurred in 1989 and 1991. Only "responsible parties" who conduct and control the activity leading to the discharge must file a CSA. 15A NCAC 2L .0115(f), .0106(c) (2005). Petitioner cannot be a "responsible party" under 2L .0115(f) or a "person conducting or controlling" the discharge under 2L .0106(c) because the discharges occurred before he acquired the property. As such, he had no obligation to file a CSA and did not violate 2L .0115(f). Accordingly, we affirm the order of the trial court.

We further note that respondents made much of petitioner's property being on the state's "Top Ten Worst UST Discharges" list and that petitioner's lack of compliance led to this result. This is an

untenable position. DENR had knowledge of a possible discharge on this property as early as 1989 and by 1991 believed that a discharge from Lancaster, Sr.'s USTs was the cause of the contaminated groundwater on the property. DENR failed to follow up with Lancaster, Sr., regarding this belief or to notify petitioner or petitioner's neighbors that such a discharge may have occurred or may be ongoing. Petitioner was in frequent contact with DENR in 1993 and 1994 regarding the tanks prior to their removal, and DENR said nothing about the contamination. DENR did not notify petitioner of the 1989 and 1991 contamination until *1998*, in response to petitioner's application for coverage under the Trust Fund. The letter stated that the release "was discovered in September 1989 when Nash County Health Department sampled the site water supply well." Petitioner is hardly the only party to blame for the detrimental impact of the discharge.

Affirmed.

Judges McGEE and STEELMAN concur.