JOHN C. RUSSELL AND WIFE, DAWN RUSSELL, PLAINTIFFS
v.
N.C. DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, DEFENDANT

No. COA12-801

Filed 21 May 2013

1. **Negligence—common knowledge—standard of care—breach of standard—no expert testimony required**

    The Industrial Commission did not err in a Tort Claims Act case by concluding that plaintiff's employee was negligent, even though plaintiff failed to offer expert testimony establishing breach of duty and causation. The common knowledge and experience of the finder of fact, the Industrial Commission in this case, was sufficient to establish the standard of care and that the employee breached the standard of care; no expert testimony was required.

2. **Damages and Remedies—property damage—replacement cost—fair market value**

    The Industrial Commission erred in a Tort Claims Act case by erroneously basing fair market value of the replacement property, as a component of the total award, on a finding not supported by the evidence. The matter was remanded to the Commission. The Commission erroneously did not 1) consider "out-of-pocket expenses," 2) measure damages according to a replacement cost

analysis, rather than a diminished value or repair cost analysis, or 3) calculate damages based on "replacement costs" rather than "repair costs."

Appeal by Defendant from decision and order entered 3 April 2012 by the North Carolina Industrial Commission. Heard in the Court of Appeals 7 January 2013.

*Attorney General Roy Cooper, by Assistant Attorney General Olga Vysotskaya, for Defendant.*

*Harvell and Collins, P.A., by Wesley A. Collins and Russell C. Alexander, for Plaintiffs.*

DILLON, Judge.

The North Carolina Department of Environment and Natural Resources (Defendant) appeals from a decision and order of the Full Commission concluding that Defendant was negligent pursuant to the Tort Claims Act. The Full Commission awarded John C. Russell and Dawn Russell (Plaintiffs) $106,674.66 in damages, plus $1,108.75 for reasonable costs associated with the action. We affirm the decision and order of the Full Commission in part and reverse and remand in part.

The evidence of record tends to show the following: In August 1998, Robert McCabe of the Carteret County Health Department issued two separate permits authorizing the construction of a wastewater system on Lot 9 and on Lot 10 (hereinafter, the Property) of the Sportsman Village subdivision located in Carteret County to the record owner, Inez Hammer. Shortly thereafter, Ms. Hammer posted signs on the Property indicating that Lot 9 and Lot 10 were each "septic approved."

On 8 April 2002, Plaintiffs contracted with Ms. Hammer to purchase the Property for $17,500.00. Plaintiffs' intent was to combine Lot 9 and Lot 10 and construct a single residence on the Property. Accordingly, prior to closing, Plaintiffs filed an application with the County to revoke the two 1998 permits issued for Lot 9 and Lot 10 and to issue a single permit for the entire Property. Before issuing the new permit, Mr. McCabe reinspected the Property. He testified that he remembered revisiting the Property in 2003; that the Property looked essentially the same as it did in 1998; and that, therefore, he did not think it was necessary to perform additional soil borings before issuing the new permit. Accordingly, on

25 February 2003, Mr. McCabe issued a new permit authorizing the construction of a single wastewater system on the Property.[1]

On 13 March 2003, Plaintiffs closed on their purchase of the Property from Ms. Hammer. Also that month, Plaintiff contracted to purchase a modular home. Over the next several months, this modular home and a septic system were installed on the Property. Plaintiffs moved into their new residence in September 2003.

Within a week after Plaintiffs moved in, the septic system began to fail. Mr. Russell testified that a "giant mud puddle began building" and that sewage "rose to the surface of the front yard[.]" Plaintiffs first contacted the septic installation contractor, Eric Pake, about the problem; and on Mr. Pake's recommendation, Plaintiffs added five truckloads of dirt to the Property. However, sewage continued to rise to the surface in the yard.

On 3 May 2005, Plaintiffs advised the County that their septic system was malfunctioning and submitted an application for repair. Later that month, Wendy Kelly, an inspector for the County, evaluated the Property on two separate occasions and discovered that the soil conditions were inconsistent with those recorded at the time of the Mr. McCabe's initial 1998 inspection. Mr. McCabe accompanied Ms. Kelly on her second visit. The Property failed a percolation test, which determines whether the soil is suitable for a septic system by measuring the rate at which soil absorbs water. Between May 2005 and January 2006, Plaintiffs met and discussed the problem with County personnel in an attempt to correct the failing septic system.

On 9 February 2006, Defendant's Regional Soil Specialist, Tim Crissman, evaluated the Property and confirmed that the soil on the Property was not the same as that shown on the issued permits which were based on Mr. McCabe's 1998 inspection, and that the soil was not suitable for the standard septic system that had been approved and installed in 2003. On 6 March 2006, Mr. Crissman issued a letter to Plaintiffs discussing the Property's soil limitations and recommending that Plaintiffs attempt to acquire rights to land adjacent to their Property that had suitable soil. Plaintiffs did subsequently attempt to acquire rights to land adjacent to their Property from the owner. However, the adjacent landowner was not interested in selling.

---

1. Defendant stipulates that McCabe, as a registered sanitarian of the Carteret County Health Department, was an agent of Defendant when he issued the 1998 and the 2003 permits.

In June 2007, Mr. Crissman recommended the installation of an above ground drip irrigation system with a "fill/mound field encompassing a 122' x 46' area in the front yard of the Property." Mr. Crissman testified that he thought that an above-ground system could provide an adequate septic system, but he could not guarantee Plaintiffs that his recommendation would resolve the issue.

On 20 July 2007, Plaintiffs filed an action against Defendant pursuant to the North Carolina Tort Claims Act, alleging negligence, gross negligence, and negligent misrepresentation. Plaintiffs also alleged that Defendant had a duty of care to Plaintiffs under the special duty exception to the public duty doctrine and that Defendant had waived sovereign immunity.

On 16 September 2011, a deputy commissioner for the Industrial Commission entered a decision concluding that Defendant was negligent under the special duty exception of the public duty doctrine and awarding Plaintiff $113,900.00 in damages and $613.75 in costs. Defendant appealed to the Full Commission. By decision and order dated 3 April 2012, the Full Commission affirmed the decision of the deputy commissioner, but modified the award to Plaintiffs to $106,674.66 in damages, plus $1,108.75 for reasonable costs. Defendant appeals from the decision and order of the Full Commission.

## I: Standard of Review

"The Tort Claims Act was enacted in order to enlarge the rights and remedies of a person who is injured by the negligence of a State employee who was acting within the course of his employment. Pursuant to the statute, the Commission has exclusive jurisdiction to hear claims falling under this Act." *Simmons v. N. Carolina Dept. of Transp.*, 128 N.C. App. 402, 405, 496 S.E.2d 790, 792-93 (1998) (citing N.C. Gen. Stat. § 143–291(a)). "Decisions of the Commission awarding damages to a plaintiff under the Tort Claims Act can only be appealed to this Court 'for errors of law . . . under the same terms and conditions as govern appeals in ordinary civil actions, and the findings of fact of the Commission shall be conclusive if there is any competent evidence to support them.' " *Id.* at 405, 496 S.E.2d at 793 (quoting N.C. Gen. Stat. § 143–293). However, "[t]his Court's review of the Industrial Commission's conclusions of law is *de novo*." *Phillips v. N.C. State Univ.*, 206 N.C. App. 258, 261, 697 S.E.2d 433, 435 (2010).

## II: Expert Testimony

Defendant first contends that the Full Commission erred in concluding that Mr. McCabe was negligent given that the Plaintiff failed to

offer any expert testimony establishing breach of duty and causation. Specifically, Defendant challenges the Commission's finding of fact number 38, which states the following:

> 38. While the evidence does not disclose how the error in soil sampling occurred in 1998, the preponderance of evidence establishes that Mr. McCabe either performed the soil site evaluation procedure incorrectly or he incorrectly identified the property for evaluation in 1998, during his initial evaluation. In 2003, Mr. McCabe did not perform a soil evaluation prior to reissuing the septic permit for the combined property.

Plaintiff argues the foregoing finding of fact demonstrates that the Commission was "uncertain as to what negligent act, if any, took place" and that "[t]here is no evidence in the record and no finding of fact to support an allegation that McCabe performed [the] soil evaluation in 1998 incorrectly." Defendant maintains that only testimony from a witness tendered as an expert in the field of sanitation can establish whether Defendant breached its standard of care to Plaintiffs. We disagree.

It is well established that "[o]rdinarily, expert testimony is required to establish the standard of care" in professional negligence cases. *Michael v. Huffman Oil Co., Inc.*, 190 N.C. App. 256, 271, 661 S.E.2d 1, 11 (2008), *disc. review denied*, 363 N.C. 129, 673 S.E.2d 360 (2009) (internal citation and quotation marks omitted). This Court has further held that "[t]he only exception to the requirement of establishing the professional standard of care by way of expert testimony is where the common knowledge and experience of the jury is sufficient to evaluate compliance with a standard of care[.]" *Handex of the Carolinas, Inc. v. County of Haywood*, 168 N.C. App. 1, 11, 607 S.E.2d 25, 31 (2005) (citation and quotation marks omitted). "The application of this 'common knowledge' exception to the requirement of expert testimony . . . has been reserved for those situations in which [the negligent act] . . . is of such a nature that the common knowledge of laypersons is sufficient to find the standard of care required, a departure therefrom, or proximate causation." *Bailey v. Jones*, 112 N.C. App. 380, 387, 435 S.E.2d 787, 792 (1993) (citation omitted); *see also Associated Indus. Contractors, Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 411, 590 S.E.2d 866, 871 (2004), aff'd, 359 N.C. 296, 608 S.E.2d 757 (2005).

On appeal, we must determine, based on the evidence presented, whether the common knowledge and experience of the finder of fact, which in this case was the Full Commission, was sufficient to establish

the standard of care and that Mr. McCabe breached the standard of care, or whether expert testimony was required.

During the hearing, Plaintiff offered the testimony of Mr. Crissman, who inspected the property in 2006, and Troy Dees, the environmental health supervisor for the Carteret County Health Department. Mr. Crissman testified that he did not find "any . . . soil" on the Property "that was suitable or provisionally suitable" for a septic system nor did he find any soil "matching [Mr.] McCabe's findings." The soil Mr. Crissman encountered on the Property "[b]ased on profile descriptions alone" was "significantly different" from that described during the 1998 evaluation.

Mr. Dees testified at the hearing that "there's a possibility" Mr. McCabe "analyzed the wrong property when he took his soil borings[.]" He believed Mr. McCabe may have analyzed part of the adjacent property because "[t]he soil profiles" or "soil descriptions" from Mr. McCabe's 1998 evaluation of Plaintiffs' property and the soil profiles from the [adjacent] property "match up[.]" Moreover, he testified that the soil profiles from Mr. McCabe's 1998 evaluation of Plaintiffs' property and Mr. Crissman's 2006 evaluation of Plaintiffs' property are not consistent.

Defendant posited that a material alteration to the Property by Plaintiffs could explain the inconsistent 1998 and 2006 evaluations. Mr. Crissman testified at the hearing that "[i]f you go back and look at the evaluation conducted by the Carteret County Health Department in '98, based on profile number one, you would have to remove more than twelve inches for it to be classified unsuitable based on the wetness condition found at twenty-four inches below the natural soil surface." Put plainly, in order to explain the inconsistency between the 1998 evaluation and the 2006 evaluation by a material alteration to the site, a foot or more of soil must have been removed from the area being evaluated. However, the evidence does not show that this sort of material alteration ever happened. On the contrary, the testimony of Eric Pake, Josh Cahoon, and Jason Hill, all of whom were familiar with the property in 1998 and at all relevant times thereafter, tends to show that the site underwent no such material alteration. Moreover, the testimony of Plaintiffs, Mr. Cahoon, and Mr. Hill tend to show that the Property was easily distinguishable from the adjacent property.

The uncontradicted testimony at the hearing showed that there is virtually no provisionally suitable soil present on the Property. Only Mr. McCabe reported that the soil on the Property was provisionally suitable in his 1998 evaluation, which contained a soil description matching the soil of the adjacent property. In his 2003 report, which was based

on a visual inspection or "walk through evaluation" of the Property, Mr. McCabe concluded the Property had not been significantly altered since his visit in 1998.[2] Mr. McCabe also admitted the following:

> The soil profiles on what we thought – well, what we know now is lot 9, were not matching up. The ones for lot 10, the closer you got over to the property line where [the lot adjacent to the Property] is, the closer they became to my evaluation. Mr. Crissman decided to walk over to the [lot adjacent to the Property]. He did a couple of borings, and they matched up very well with my previous evaluations.

We believe that the common knowledge and experience of the finder of fact was sufficient to permit a determination of whether Mr. McCabe acted negligently based on the testimony and evidence of record and that expert testimony was not required on the issue of whether Mr. McCabe breached the standard of care. We believe that "understanding" the task in this case – the procedure by which Mr. McCabe should have evaluated the Property for purposes of determining whether the Property was suitable for a septic system – "does not involve esoteric knowledge or uncertainty that calls for the professional's judgment nor is it beyond the knowledge of the trier of fact[.]" *Associated Indus. Contractors, Inc.*, 162 N.C. App. at 412, 590 S.E.2d at 871 (concluding that "the nature of [the surveyor]'s actions fell within the 'common knowledge' exception to the requirement that experts testify as to the requisite standard of care[;] [i]t is within the common knowledge of a trier of fact that a surveyor hired to pinpoint columns for a rectangular building site that must be precisely square must accurately mark column locations so as to result in two sets of parallel lines connected by four 90° angles"). The evidence in this case shows that "[t]he soil profiles" or "soil descriptions" from Mr. McCabe's 1998 evaluation did not match the soil on the Property but rather matched the soil on an adjacent lot. We conclude that the trier of fact could determine, based on the evidence in this case and the common knowledge exception to the expert testimony requirement, whether Mr. McCabe breached the standard of care by performing soil tests on the wrong lot, and we further conclude that the evidence presented at the hearing was sufficient to support finding of fact number 38.

---

2. Mr. McCabe was unable to produce "any [official] documentation in the file indicating that [he] did in fact visit the property in 2003." However, during an earlier deposition when asked if he, in fact, visited the Property in 2003, Mr. McCabe responded, "Yes, sir, most likely."

## II:  Measure of Damages

The Full Commission awarded Plaintiffs damages in the amount of $106,674.66, noting that "[t]his amount is a calculation of plaintiff's (sic) replacement costs less the remaining fair market value of their current property." In calculating its award, the Full Commission expressly relied on *Feierstein v. NCDENR*, 202 N.C. App. 147, 690 S.E.2d 588 (2010) (unpublished), which involved a similar fact pattern as the case *sub judice* and in which DENR was also the defendant.

Defendant contends that the Full Commission erred as a matter of law by applying the incorrect measure of damages. Specifically, Defendant argues that the Full Commission erroneously (1) considered "out-of-pocket expenses," but "inexplicably labeled these expenses as 'replacement costs,' " (2) based its decision regarding the replacement value of the Lots on MLS listing prices of various lots; (3) measured damages according to a replacement cost analysis, rather than a diminished value or repair cost analysis; and (4) failed to consider that Plaintiffs did not mitigate their damages in the award. We address each argument in turn.

First, Defendant argues that the Full Commission inappropriately considered "out-of-pocket expenses," but "inexplicably labeled these expenses as 'replacement costs,' " in its damages award. Defendant relies on the *Feierstein* decision for this proposition. As an initial matter, we note that *Feierstein* is an unpublished opinion and, therefore, not authoritative on this point. N.C.R. App. P. 30(e)(3). Moreover, the Full Commission did not award Plaintiff any out-of-pocket expenses in this case that the analysis in *Feierstein* would prohibit. In *Feierstein*, this Court held that a determination of damages based on "out-of-pocket" expenditures was erroneous: The Court stated that "the effect of the Commission's decision was to award the Feiersteins what appears to be an amount equal to all of their out-of-pocket expenditures associated with the Hyco Lake lot, including the cost of purchasing it[;] [i]n other words, the Commission appears to have used an 'out-of-pocket expenditures' measure of damages." *Id.* The Court further stated that the decision of the Full Commission in *Feierstein* was "clearly not based on any evidence tending to show the amount that would be necessary to purchase a replacement lot or to modify the Feiersteins' lot so that it would support some sort of sewage disposal system." *Id.* We believe *Feierstein* is distinguishable from this case because the decision of the Full Commission in this case was based on the "amount that would be necessary to purchase a replacement lot[.]" *Id.*; *see also Huberth v. Holly*, 120 N.C. App. 348, 354, 462 S.E.2d 239, 243 (1995) (stating that

"[w]hen, however, the land is used for a purpose that is personal to the owner, the replacement cost is an acceptable measure of damages") (citing *Plow v. Bug Man Exterminators, Inc.*, 57 N.C. App. 159, 162-63, 290 S.E.2d 787, 789, *disc. rev. denied*, 306 N.C. 558, 294 S.E.2d 224 (1982) (stating, in a case involving an allegedly negligent failure to detect the presence of termites in a house prior to purchase by the plaintiff, that, "[w]hile the difference in market value before and after the injury is one permissible measure of damages, it is by no means the only one" and that "[d]amages based on cost of repair are equally acceptable"). Specifically, the Full Commission found that it would "cost [Plaintiffs] a total of $113,674.66 to purchase a replacement lot, move their modular home to the new lot, and prepare the new lot for the placement of the home." The Full Commission then deducted "[t]he market value of their existing lot[,]" which the Full Commission determined was $7,000, "from plaintiffs' replacement costs," so that the Full Commission awarded damages in the amount of $106,674.66. We note that the Full Commission made findings of fact detailing out-of-pocket expenditures Plaintiffs made in purchasing, improving, and resolving the problems associated with the Property; however, the Full Commission did not base any part of its damages award on the foregoing expenditures. Therefore, we find Defendant's first argument without merit.[3]

Second, Defendant argues that in Findings of Fact numbers 41 and 42, the Full Commission erroneously based its decision regarding the replacement value of the lots on the testimony of Ed Daughety, a real estate broker who was tendered as an expert on the Multiple Listing Service (MLS). Specifically, the Full Commission's award included a component for the cost to purchase comparable lots. The Full Commission concluded that this component was $55,000 based on its Findings of Fact numbers 41 and 42, which state the following:

> 41. Ed Daughety, a North Carolina licensed real estate agent, testified before the Deputy Commissioner and provided reports that similar property available for sale in the same general area as plaintiffs' property, with septic

---

3. Because of the nature of the Full Commission's award in this case, it is not necessary for us to reach the question of whether certain "out-of-pocket" costs would ever be allowed where they are incurred in reliance on the negligent issuance of a septic permit. *See Watts v. NCDENR*, 182 N.C. App. 178, 185-86, 641 S.E.2d 811, 819 (2007), *aff'd and modified*, 362 N.C. 497, 666 S.E.2d 752 (2008) (stating that, in a case involving the negligent issuance of a septic permit, a tortfeasor, generally, "is responsible for all damages directly caused by the misconduct and for all indirect or consequential damages which are the natural and probable effect of the wrong").

permits issued, is listed for sale from $27,500.00 per lot to $35,000.00 per lot. Mr. Daughety testified that two adjacent lots would be required to make up the similar acreage of plaintiffs' property *and such properties would likely sell for approximately 88% of the list price.* Mr. Daughety's report stated that plaintiffs' current property is .853 acres. Mr. Daughety identified several side by side lots with septic permits that are of similar size to plaintiffs' property if combined into one lot.

42. The average cost of two lots of similar acreage to plaintiffs property, in a similar location, and with suitable septic permits is $55,000 ($35,000 x 2 lots = $70,000 and $70,000 x .88 = $61,600. $27,500 x 2 lots = $55,000 and $55,000 x .88 = $48,400. $61,600 + $48,400 = $110,000 and $110,000/2 = $55,000.).

(Emphasis added.) We believe the portion of Finding of Fact 42 stating that "Mr. Daughety testified that [the replacement lots] would likely sell for approximately 88% of the list price" is not supported by any evidence in the record. Before the Deputy Commissioner, Mr. Daughety gave the following testimony on direct examination:

Q. Okay. Have you done any type of investigation to determine what comparable properties to the Russell's property sell for as percentage of list price?

A. I didn't do it that way, but what I did do, I went back and pulled properties that have sold in his area from twelve of '05 through eleven of '07. It was fourteen properties, and it averaged out eighty-eight percent of list price.

Q. Okay. Meaning the – the closing price –

A. The closed price was eighty-eight percent average of the listed price.

Q. Okay. And that's for period of time from '05 to current?

A. Uh-huh. Well, the last property there was eleven of '07.

Q. Just haven't been many sales.

A. That's right.

Q. You said there were fourteen total.

A. Fourteen from '05 to '07.

On cross-examination when asked why there was an approximate ten thousand dollar·discrepancy between the list price of a .34 acre lot with a septic permit, which was listed at $25,000.00, and a .35 acre lot without a septic permit, which was listed at $36,900.00, Mr. Daughety stated, "I don't have a clue." Mr. Daughety continued:

> Q. So do you have a clue what these lots will sell for?
>
> A. Kind of, ma'am. I can give you history.
>
> Q. But you have no clue why there is a more than ten – almost fifteen – hold on. Let me see with my math – more than $10,000.00 difference in price for the lots of the comparable –
>
> A. They were listed by two different agents, and two different owners.
>
> Q. Well, doesn't the market dictate the prices usually?
>
> A. I've been preaching that a long time. They don't listen.
>
> Q. But – so you have no clue – you have no clue at all, right?
>
> A. No, I don't.
>
> Q. Okay.
>
> A. I know we've been averaging eighty-eight percent of a list price, but now this is side-by-side, and I see where you're coming from. One owner wants a price, another owner wants a price.
>
> Q. Yeah, you see where I'm coming from, right?
>
> A. I do. I do.
>
> Q. There is – there is clearly a mismatch between prices of these two lots.
>
> A. All over the county is a mismatch.
>
> Q. And you don't know what it would sell for.
>
> A. . . . No.

Although on direct examination Mr. Daughety provided evidence that between the years of 2005 and 2007, fourteen properties sold for a purchase price that "averaged out [to] eighty-eight percent of list price" and

on cross-examination, he testified that "we've been averaging eighty-eight percent of the list price[,]" Daughety never testified that similar "properties would *likely* sell for approximately 88% of the list price[.]" as found by the Full Commission[4] In fact, Mr. Daughety never testified that any particular property ever sold for 88% of the list price. He was never asked nor did he ever state specifically his opinion as to the value of the replacement lots or what he thought they might sell for. Therefore, we conclude that the portion of Finding of Fact number 42, stating that Mr. "Daughety testified that . . . such properties would likely sell for approximately 88% of the list price[,]" is not supported by any evidence. We therefore reverse this portion of the Full Commission's decision and order and remand to the Full Commission. The Full Commission may, if necessary, take additional evidence on the question of the value of replacement property with suitable soil that is otherwise comparable to the Property.

Third, Defendant argues the Full Commission erroneously measured damages according to a replacement cost analysis, rather than a diminished value or repair cost analysis. We find this argument meritless. This Court has held that a replacement cost analysis is appropriate where a property owner relies on an inspection that was performed negligently. *Plow*, 57 N.C. App. at 162-63, 290 S.E.2d at 789. In *Plow*, this Court addressed the question of the appropriate measure of damages in a case involving an allegedly negligent failure to detect the presence of termites in a house prior to purchase by the plaintiff. The defendant in *Plow* was "an extermination company engaged for the sole purpose of providing the buyer with assurance that the house he planned to purchase was free of termites." *Id.* at 162, 290 S.E.2d at 789. The Court reasoned that "the buyer has relied to his detriment on representations made by an independent pest-control inspector who was paid for his inspection report and unquestionably could foresee the buyer's reliance upon the accuracy of the report[.]" *Id.* The Court in *Plow* stated that, "[w]hile the difference in market value before and after the injury is one permissible measure of damages, it is by no means the only one[,]" and that "[d]amages based on cost of repair are equally acceptable." *Id.*

---

4. The record contains two letters written by Daughety which were introduced as exhibits during his testimony. However, the letters only contain information regarding possible replacement properties that were on the market, but did not contain any information suggesting what they might sell for as a percentage of their respective list price. An investigation conducted by Mr. Daughety was discussed during his testimony which set forth information about the fourteen properties which sold between 2005 and 2007 which he testified sold for an average of 88% of list price. However, a written report about this investigation is not part of the record.

at 162-63, 290 S.E.2d at 789. Moreover, "replacement and repair costs are relevant on the question of diminution in value[.] . . ." *Huberth*, 120 N.C. App. at 353, 462 S.E.2d at 243 (citations omitted). Notwithstanding, the award may not, however, be "so large as to shock the conscience." *Jackson v. N.C. Dept. of Crime Control*, 97 N.C. App. 425, 432, 388 S.E.2d 770, 774, *disc. review denied*, 326 N.C. 596, 393 S.E.2d 878 (1990). We believe the award in this case is not so large as to shock the conscience, and we therefore reject this aspect of Defendant's challenge to the Full Commission's decision with respect to the issue of damages.

Fourth, Defendant argues the Full Commission failed to consider that Plaintiffs did not mitigate their damages by installing an onsite replacement wastewater system, which Defendant argues would have been a less expensive alternative. This argument, though couched as a "mitigation of damages" argument, is actually an argument that the Full Commission did not use the proper "measure of damages." Specifically, Plaintiff argues that the Full Commission should have calculated damages based on "repair costs" rather than "replacement costs." The Full Commission made the following findings of fact with regard to the repair option:

> 47. . . . The low pressure pipe mound system or the drip irrigation system represented the best professional judgment of Mr. Crissman that might correct the septic system; however, these alternatives were not guaranteed to provide an adequate septic system for the property.
>
> . . .
>
> 49. The Full Commission finds that it was reasonable for plaintiffs to decline to attempt to install a replacement septic system based on the high price of the replacement system and the fact that plaintiffs were warned by agents of defendant that there was no guarantee that the replacement would be effective.

Our review of the record reveals that the foregoing findings of fact are supported by competent evidence.

For the foregoing reasons we affirm the decision and order of the Full Commission, in part; however, we reverse the portion of the decision and order erroneously basing fair market value of the replacement property, as a component of the total award, on a finding not supported by the evidence, and we remand this case to the Full Commission, at which time the Full Commission may, in its discretion, take additional

evidence on this component. To avoid a result that might unjustly enrich Plaintiffs, this component of the replacement cost damages should be based on a determination of the fair market value of the Property had it had suitable soil.

AFFIRMED, in part; REVERSED and REMANDED, in part.

Chief Judge MARTIN and Judge ERVIN concur.