IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-189

Filed: 1 March 2016

Forsyth County, No. 13 CVS 2793

B S K ENTERPRISES, INC. AND B. KELLEY ENTERPRISES, INC., Plaintiffs,

v.

BEROTH OIL COMPANY, Defendant.

Appeal by plaintiffs from order, judgment, and rulings entered 5 and 26 June 2014 by Judge Ronald Spivey in Forsyth County Superior Court. Cross-appeal by defendant from orders entered 22 May 2014, 5 and 26 June 2014, and 9 July 2014 by Judge Ronald Spivey in Forsyth County Superior Court. Heard in the Court of Appeals 6 October 2015.

Crabtree, Carpenter & Connolly, PLLC, by Guy W. Crabtree and Mark Fogel, for plaintiff-cross-appellees.

Maynard & Harris Attorneys at Law, PLLC, by C. Douglas Maynard, Jr., and Sarah I. Young, for plaintiff-cross-appellees.

Hendrick Bryant Nerhood Sanders & Otis, LLP, by Matthew H. Bryant and Timothy W. Nerhood, for defendant-cross-appellants.

Hatch, Little & Bunn, LLP, by Justin R. Apple, Harold W. Berry, Jr., and A. Bartlette White, for amicus curiae North Carolina Petroleum & Convenience Marketers, Inc.

Law Office of F. Bryan Brice, Jr., by Matthew D. Quinn, for amicus curiae North Carolina Advocates for Justice.

*Troutman Sanders LLP, by Christopher G. Browning, Jr., Sean M. Sullivan, and C. Elizabeth Hall, for amicus curiae North Carolina Chamber.*

BRYANT, Judge.

First, where the cost of remediation greatly exceeds or is disproportionate to the diminution in value of property, the measure of damages should be the diminution in value caused by the contamination. Second, plaintiffs have a compensable and protectable interest in the waters beneath their land and, therefore, have standing to bring an action to remediate groundwater contamination. Third, where there is no evidence presented at trial to support a defense regarding the duty to mitigate, the trial court did not err in denying defendant's request to give a duty to mitigate instruction to the jury. Fourth, the trial court did not err in awarding damages where the court's judgment awarding $108,500.00 to plaintiff was for damages related to "nuisance, trespass, and violation of NCOPHSCA [North Carolina's Oil Pollution and Hazardous Substances Control Act]," and not damages related to stigma. Lastly, the trial court did not err in denying a motion for judgment notwithstanding the verdict where plaintiffs' claims of nuisance and trespass did not fail as a matter of law.

On 6 May 2013, plaintiffs filed a complaint alleging defendant was strictly liable for contaminated groundwater under plaintiffs' property, and sought damages to cover the cost of remediation or relocation of its business from the property. In an answer filed 30 May 2013, defendants admitted that a petroleum release on

defendant's property was discovered on 3 June 2005, but otherwise denied all other allegations made in plaintiff's complaint. After months of additional pleadings, pretrial motions, and orders, trial by jury commenced on 27 May 2014.

Defendant Beroth Oil Company was formed in 1958 as a gasoline jobber supplying fuel to gas stations. In 1987, defendant purchased an existing gas station at 4975 Reynolda Road, Winston-Salem (hereinafter "defendant's property") and in May 1988 installed five underground storage tanks ("USTs").

In March 2005, defendant prepared to market its property for sale. Defendant conducted an environmental survey of the land to provide to prospective buyers. Defendant's engineering firm, Terraquest, performed a phase-2 environmental site assessment and discovered that the USTs under defendant's property had been leaking petroleum. Defendant, through Terraquest, reported the leak to the North Carolina Department of Environment and Natural Resources ("DENR") on 3 June 2005. DENR responded and directed defendant to perform a comprehensive site assessment ("CSA"). (A CSA is a report including information DENR needs to determine the vertical and horizontal extent of the contamination.)

On 9 February 2006, plaintiffs BSK Enterprises and B. Kelley Enterprises, Inc. (collectively "plaintiffs") purchased a metal frame building at 4995 Reynolda Road, adjacent to defendant's property, for $130,000.00. Plaintiffs used the building as a warehouse and distribution facility for plaintiffs' water filter and coffee business.

From May to August 2010, Terraquest conducted a well-water survey to determine the location, number, and operating status of wells in the vicinity of defendant's property. On 28 June 2010, plaintiffs received a letter from DENR which indicated that a well-water sample taken from the well on plaintiffs' property had detected contaminates and that such testing was part of an investigation of a petroleum leak. On 8 November 2010, plaintiffs received a certified letter from Terraquest requesting access to plaintiffs' property for the installation of monitoring wells to assess the extent of groundwater contamination caused by a release of petroleum from defendant's property. Defendant did not receive approval from plaintiffs to install the wells until May 2011.

On 19 October 2011, Terraquest's findings were reported to DENR in a CSA report, per DENR's request. Terraquest determined that no "free product"[1] or soil contamination was found on plaintiffs' property. The release of dissolved petroleum constituents in the groundwater from defendant's property had migrated under plaintiffs' property as a "dissolved phase plume"[2] in the subsurface groundwater. On 29 November 2011, DENR ordered that a Corrective Action Plan ("CAP") be submitted to DENR.

---

[1] Free product is a concentration of petroleum in a particular area.
[2] A plume is the area where contamination has migrated, and a dissolved phase plume means that gas has dissolved in the water such that it is not visually detectable.

As of March 2013, levels of contamination in the groundwater in the monitoring wells on plaintiffs' property were under Gross Contaminate Levels ("GCLs")[3] but above the "2L standards"[4] for some petroleum constituents.

On 10 October 2013, Terraquest submitted its CAP for DENR's review. The CAP examined multiple remediation strategies for defendant's property only and discussed each in detail. The CAP proposed using the following active remediation methods: (1) Air Sparging, which reduces the dissolved phase plume in groundwater; (2) Mobile Multi-Phase Extraction ("MMPE"), which removes free product; and (3)

---

[3] As explained at trial by environmental consultant Ryan Kerins of Terraquest Environmental Consultants,

> [G]ross contamination levels . . . are for the most part . . . a thousand times the 2Ls and they are used more in the risk function. They exist as a risk so when you are ranking sites high, intermediate or low where do they fall? If there are no wells with people drinking water out of [them] and there's not an explosion threat or anything like that then maybe it is not a high risk but if there is still contamination above a thousand times the drinking water standard then it is something that needs to get dealt with.

[4] At trial, Kerins also defined "2L standards":

> 2L standards are viewed every three years by the environmental management commission. They are the maximum allowable levels of contaminants without endangering human health or otherwise impacting any drinking water source. [The commission] want[s] to make sure that there's not more than a one and [sic] a million chance in a lifetime at a particular contamination level that you would be at added risk of cancer . . . .
>     [The commission] also consider[s] things like the taste threshold, other secondary type[s] of contaminants. They look at the federal contamination levels when they come up with these 2L standards. So those are the strictest standards.

2L standards are also defined in Title 15A NCAC 2L.0202(g).

Soil Vapor Extraction, which reduces soil contamination. There was no active remediation proposed for plaintiffs' property.

In response to concerns raised by plaintiffs regarding the lack of corrective action for plaintiffs' property, DENR explained that the highest contamination was on defendant's property and that addressing the source area on defendant's property would have the biggest impact on the dissolved phase plume on plaintiffs' property and was the typical approach for groundwater cleanups in North Carolina. Additionally, according to DENR, the active remediation performed on defendant's property would remediate plaintiffs' property by the process of natural attenuation. DENR explained that natural attenuation is a passive remediation strategy by which plaintiffs' property will be the recipient of the collateral effects of the active remediation occurring on defendant's property. At least one expert opined that it may take as long as twenty-five years for remediation through natural attenuation to occur as anticipated on plaintiff's property. However, by reducing the contamination on defendant's property, contamination levels on plaintiffs' property would be reduced as well. Terraquest's remediation strategies as set forth in its CAP were commonly accepted methods, and DENR considered them to be aggressive strategies. DENR approved the CAP.

Between 2010 and 2014, Terraquest conducted several MMPE events to remove free product, which resulted in a reduction of free product levels on

defendant's property from 3.4 feet to 3 inches. The active removal of free product from defendant's property also had a positive effect on the contaminate levels in the dissolved phase plume under plaintiffs' property, including reduced levels of benzene[5] in monitoring wells on plaintiffs' property. From 28 January 2013 to March 2014, benzene levels in one monitoring well went down from 2,200 (parts per billion) to 750 and in another monitoring well, the levels went from 690 to 140. At trial, Thomas Moore, an employee of DENR, testified that, based on his reaction to these numbers, the remediation system was working and effectively cleaning up the contamination.

Defendant has admitted that it caused the release of petroleum products into the groundwater on defendant's property, which in turn migrated onto plaintiffs' property and contaminated the groundwater. However, a water supply well test concluded that there was no restriction on the use of the well on plaintiffs' property—in other words, the water did not pose a health risk. Plaintiffs nevertheless installed water filtration systems on the property.

Plaintiffs employed an environmental engineer, Tom Raymond, to assess the costs of a cleanup. Using data and reports from Terraquest, Raymond proposed chemical oxidation and groundwater barrier remediation systems for a total cost of $1,131,000.00. Additionally, Raymond proposed drilling injection wells on plaintiffs'

---

[5] Benzene is one of the compounds found in both gasoline and diesel fuel and is carcinogenic. The acceptable health level groundwater drinking standard for benzene in North Carolina is one part per billion. *See* 15A NC ADC 2L.0202(h)(9) (2013) (stating that the maximum allowable concentration for benzene in groundwater is 1 microgram per liter).

property. Raymond also acknowledged that it is highly unusual for a property owner that is not the responsible party to undertake remediation of the contaminated property: "That would be pretty rare for a non-responsible party to conduct a cleanup."

On 22 May 2014, just prior to trial, the trial court granted plaintiffs' partial summary judgment motion on its claims for nuisance and trespass, but not on damages, and denied defendant's motion for summary judgment. On 27 May 2014, the case was called for jury trial.

The jury found that plaintiffs' property had a fair market value of $180,000.000 in an uncontaminated state; a fair market value of $71,500.00 in its contaminated state. This resulted in a diminution in value of $108,500.00. The jury determined that the amount reasonably needed to remediate plaintiffs' property was $1,492,000.00. The jury's verdict notwithstanding, the trial court, on 5 June 2014, entered a "Post Verdict Order" which capped the remediation damages at $108,500.00, the diminution in value of the property caused by the contamination. Defendant filed a motion for judgment notwithstanding the verdict ("JNOV") and a Motion to Amend the Judgment. Judgment was entered for plaintiffs in the amount of $108,500.00 with interest and costs on 26 June 2014, and the trial court denied defendant's motions on 9 July 2014. Plaintiffs filed notice of appeal, and defendant filed notice of cross-appeal.

On appeal, plaintiffs' sole issue is whether the trial court erred in ruling that the damages necessary to remediate the contamination on plaintiffs' property were properly capped at $108,500.00, the amount of the diminished value of the property, instead of awarding reparation damages.

On cross-appeal, defendant argues that the trial court erred by: (I) not dismissing plaintiffs' claims for lack of standing; (II) omitting duty to mitigate instructions; (III) awarding damages for diminution in value related to stigma; and (IV) denying defendant's motion for judgment notwithstanding the verdict as plaintiffs' claims for nuisance and trespass fail absent evidence of real and substantial interference with use of the property.

*Plaintiffs' Appeal*

Plaintiffs argue that the 5 June 2015 Post-Verdict Order and 26 June 2014 Judgment entered by the trial court capping damages at $108,500.00—the diminution in value caused by the contamination—should be reversed and vacated and that judgment should be entered in favor of plaintiffs for $1,492,000.00, the amount of restoration damages as determined by the jury. Specifically, plaintiffs argue that capping the damages at diminution in value frustrates the purpose of NCOPHSCA and is contrary to legislative intent and public policy. We disagree.

The proper measure of damages is a question of law and fully reviewable by this Court. *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 548, 356 S.E.2d 578, 586–87 (1987). "While the amount of damages is ordinarily a question of fact, the proper standard with which to measure those damages is a question of law." *Id.*

Under North Carolina law, damages to land may be recovered using one of two measures: (1) the difference in market value before and after the injury; or (2) the cost of restoring the land to its pre-injury state. *Plow v. Bug Man Exterminators, Inc.*, 57 N.C App. 159, 162–63, 290 S.E.2d 787, 789 (1982). "[F]or negligent damage to real property, the general rule is that where the injury is completed (as opposed to a continuing wrong) the measure of damages 'is the difference between the market value of the property before and after the injury.' " *Huberth v. Holly*, 120 N.C. App. 348, 353, 462 S.E.2d 239, 243 (1995) (quoting *Huff v. Thornton*, 23 N.C. App. 388, 393–94, 209 S.E.2d 401, 405 (1974), *aff'd*, 287 N.C. 1, 213 S.E.2d 198 (1975)).

"Nonetheless, replacement and repair costs are relevant on the question of diminution in value[,] and when there is evidence of both diminution in value and replacement cost, the trial court must instruct the jury to consider the replacement cost in assessing the diminution in value." *Id.* at 353, 462 S.E.2d at 243 (citations omitted). However, North Carolina courts have advised that the diminution-in-value measure of damages with respect to harm to real property suffers from excess rigidity, and should be applied, if at all, with caution. *Phillips v. Chesson*, 231 N.C. 566, 571,

58 S.E.2d 343, 347–48 (1950). Rather, when the damage to land is "impermanent" in nature, diminution in value is not an appropriate measure of damages:

> While the general rule for assessing damages to real property is diminution in market value, that measure is not appropriate where . . . the damage complained of is "impermanent." In a case involving damages of an "impermanent" nature, "various other rules are applied, such as . . . reasonable costs of replacement or repair."

*Casado v. Melas Corp.*, 69 N.C. App. 630, 637–38, 318 S.E.2d 247, 251 (1984) (quoting *Phillips*, 231 N.C. at 571, 58 S.E.2d at 348). "[T]he cause of [an] injury is impermanent in the sense that it may be removed by the offender voluntarily or abated . . . ." *Phillips*, 231 N.C. at 571, 58 S.E.2d at 348.

Notwithstanding the permanent or impermanent nature of an injury, "the award may not, however, be 'so large as to shock the conscience.' " *Russell v. N.C. Dep't of Env't & Natural Res.*, 227 N.C. App. 306, 318–19, 742 S.E.2d 329, 337–38 (2013) (quoting *Jackson v. N.C. Dep't of Crime Control*, 97 N.C. App. 425, 432, 388 S.E.2d 770, 774 (1990)) (reversing a damages award based on the fair market value of the replacement property as a component of the total awarded, remanding the case and instructing that, "*[t]o avoid a result that might unjustly enrich Plaintiffs*, this component of the replacement cost damages should be based on a determination of the fair market value of the [p]roperty had it had suitable soil" (emphasis added)). Similarly, the commentary to the *Restatement (Second) of Torts* § 929, while placing no limitation on damages based on proportionality, nevertheless states that:

> [i]f, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, *unless there is a reason personal to the owner for restoring the original condition*, damages are measured only by the difference between the value of the land before and after the harm.

*Restatement (Second) of Torts* § 929(1)(a) cmt. b (1979) (emphasis added).

"[A] reason personal to the owner for restoring the original condition" is an exception which permits the recovery of restoration costs to repair damage to real property even when such costs exceed the value of the land itself. *See id.* For example, "if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building." *Id.*

Businesses have not typically fallen within the ambit of the "personal reasons" or "personal use" exception and the *Restatement (Second) of Torts* § 929 mentions only homesteads, not corporations. *See Restatement (Second) of Torts* § 929(1)(a) cmt. b; *see also Russell*, 227 N.C. App. at 308, 742 S.E.2d at 331–32 (involving a failed septic system in a modular home installed on the property intended for residential use); *Plow*, 57 N.C. App. at 161–62, 290 S.E.2d at 788–89 (involving termite damage to a personal residence); *see also Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 338 Mont. 259, 272, 165 P.3d 1079, 1088 (2007) (involving an action for contamination of plaintiffs' personal residences with a carcinogen and noting "[a] personal residence represents the type of property in which the owner possesses a personal reason for repair" and

"that the personal reasons for repair are usually the owner's desire to enjoy and live in their homes"). *But see G & A Contractors v. Alaska Greenhouses*, 517 P.2d 1379, 1387 (Alaska 1974) (holding that restoration damages awarded to corporation were proper even though they computed to a value of approximately $50,000.00 per acre to restore property for which the plaintiff paid $4,000.00 per acre).

In addition to the common law concerning tort claims and remedies, North Carolina has adopted the Oil Pollution and Hazardous Substances Control Act ("OPHSCA"), which was enacted "to promote the health, safety, and welfare of the citizens of this State by protecting the land and the waters over which this State has jurisdiction from pollution by oil, oil products, oil by-products, and other hazardous substances." N.C. Gen. Stat. § 143-215.76 (2015). "To accomplish this purpose, Part 2 of OPHSCA contains various provisions to control the discharge of oil." *Jordan v. Foust Oil*, 116 N.C. App. 155, 163, 447 S.E.2d 491, 496 (1994). Furthermore,

> [i]n enacting Part 2 of OPHSCA, the Legislature clearly intended to provide broad protection of the land and waters of North Carolina from pollution by oil and other hazardous substances and to thereby promote the health, safety, and welfare of the citizens of this state. Liability for damages caused to persons and property by unlawful discharges is broadly and strictly imposed on "any person having control over" such oil or other hazardous substances.

*Id.* at 164, 447 S.E.2d at 496–97 (quoting N.C. Gen. Stat. § 143-215.93). However, OPHSCA does not preempt or extinguish common law rights of landowners to bring claims of nuisance, trespass, etc. against polluters: "This subsection [of OPHSCA]

shall not be construed to limit any right or remedy available to a third party under any other provision of law." N.C. Gen. Stat. § 143-215.94B(b3) (2015).

Plaintiffs argue that because OPHSCA is intended to broadly and strictly impose liability for damages on the responsible party, the statute is intended to provide broad relief to victims of past and present damages, as well as to protect victims from future pollution. Plaintiffs assert that limiting damages to the diminution of the market value would essentially permit a defendant to contaminate a neighbor at will and without limitation as long as the defendant is willing to pay for the reduction in value caused by the contamination. Further, plaintiffs assert that the State-approved CAP, which is in place to clean defendant's property only, holds plaintiffs hostage to the preferred cleanup methods of the State. The CAP in this case is against public policy, plaintiffs argue, because (1) North Carolina is required by law to approve the "least expensive cleanup," and (2) a No Further Action letter may be issued at any time when the State determines that the amount of risk imposed by the contamination has reached an "acceptable level." *See* N.C. Gen. Stat. §§ 143-215.94A(2a)(d), 143-215.94V(d) (2015).

Plaintiffs therefore contend that the only appropriate remedy in this case is for restoration damages to be awarded so that plaintiffs will have control over cleaning up their property and ensure that the cleanup will happen much more quickly and effectively and in accordance with the purposes of OPHSCA. We disagree.

Here, the trial court found that the injury to plaintiffs' property was temporary or impermanent and the jury found that plaintiffs' property had a fair market value of $180,000.00 in an uncontaminated state and a fair market value of $71,500.00 after contamination. The jury also found the remediation costs to be $1,492,000. The trial court found the diminution in value of the property to be $108,500.00. The trial court agreed with plaintiffs that "the measure of damages for a temporary injury to real property in North Carolina is the restoration costs, or costs of remediation . . . ." Notwithstanding its agreement as to the measure of damages, the trial court found the following:

> [W]hen the cost of the remediation greatly exceeds or are [sic] disproportionate to the diminution in value of the property, the measure of damages should be the diminution in value caused by the contamination. The 1.492 million dollars of remediation costs awarded by the jury are more than 13 times the diminution in value as found by the jury . . . . This court will find that the remediation award is disproportionate to the diminution in the value of the property.

The trial court entered judgment in favor of plaintiffs in the amount of $108,500.00, for damages as a result of nuisance, trespass, and violation of OPHSCA.

The trial court noted in its extensive and comprehensive post-verdict order that this is an issue of first impression in North Carolina. As such, the trial court addressed numerous cases from other jurisdictions that apply different measures of damages in similar situations for migration of contaminants. Based on the trial

court's ultimate order, however, it appears that the trial court found Section 929 of the *Restatement (Second) of Torts* and its commentary the most instructive. *See Restatement (Second) of Torts* § 929(1)(a) cmt. b. For the following reasons, we agree with the trial court's assessment of the appropriate measure of damages and subsequent award of $108,500.00 in the instant case.

First, this Court has held that "[w]hile the general rule for assessing damages to real property is diminution in market value, that measure is not appropriate where . . . the damage complained of is " 'impermanent.' " *Casado*, 69 N.C. App. at 637, 318 S.E.2d at 251. When the damage inflicted is impermanent in nature, the amount of damages assessed should be for the reasonable costs of replacement or repair. *Id.* at 637–38, 318 S.E.2d at 251. In *Casado*, the grading and paving of a road caused a "delta" of sediment composed of leaves, sticks, gravel, and other debris to be deposited into the plaintiff's pond. Although the court found that the delta was permanent, it was continuing to grow by additional sediment being deposited daily, and as such it was an impermanent or continuing injury for the purpose of measuring damages. *Id.* at 631–36, 318 S.E.2d at 248–50. As a result, the court in *Casado* remanded the case, finding that the "reasonable costs of replacement or repair" were the proper measure of damages. *Id.* at 637, 318 S.E.2d at 251; *see also Phillips*, 231 N.C. at 569–71, 58 S.E.2d at 346–48 (ordering a new trial because the court erroneously instructed the jury to compute damages under the diminution-in-value standard, rather than the

reasonable cost of replacement or repair, where one private landowner's diversion of the natural flow of surface water caused periodic flooding, which in turn caused extensive damage to buildings on the private landowner's property).

Here, the contamination complained of is not sediment, debris, or surface water causing damage. Rather, the contamination is the result of the release of petroleum associated with commercial gasoline, diesel, and kerosene from underground storage tanks ("USTs") on defendant's property. More specifically, the contamination is the result of the migration of a dissolved phase plume from defendant's to plaintiffs' property, which is currently found at a depth of approximately twenty-five feet below the surface of plaintiffs' property. The contamination cannot be seen, smelled, touched, nor is it otherwise disruptive, intrusive, dangerous, or harmful.

Here, defendant is and has been actively working to remediate the migration of contamination through the implementation of a CAP. Free product levels on defendant's land have gone from 3.4 feet to just a few inches and, within six months, contaminate levels in the groundwater under plaintiffs' property have already been reduced. While plaintiffs' property did have contamination, no actual free product or petroleum was detected there, and there were no risks to the health and safety of anyone due to the contamination. With regard to any actual damage caused and

health risks posed by the amount of contamination on plaintiffs' property, the

following direct examination of Thomas Moore, employee of DENR is illustrative:

> Q. But in general – how is the CAP performing today?
>
> . . .
>
> A. I feel like the strategy that was chosen by Terraquest [the environmental consulting agency hired by defendant to conduct the cleanup] is an appropriate strategy and that we are seeing the evidence of the clean up being effective.
>
> Q. Where is [plaintiffs'] well in relationship to the plume?
>
> A. The well, [plaintiffs'] well, is right here (indicating).
>
> Q. Do you know the depth of his well?
>
> A. I do not.
>
> Q. Do you know the death [sic] of the groundwater that has contaminants in it?
>
> A. The depth of the groundwater is about 25 to 30 feet. It is somewhere in there. It kind of fluctuates but that is generally the depth of it.
>
> Q. From your experience these levels of particulates that are in – that are listed on these two tables, how would you describe those level's [sic]?
>
> A. In reference to both properties?
>
> Q. In reference to – on the [plaintiffs'] property?
>
> A. The contamination that we're seeing on the [plaintiffs'] property is, in our view, not significant. That does not mean there is not contamination there it just means it is not significant enough for us to directly provide a

remediation strategy for it.

Q. Is any human being coming into contact with any of those petroleum constituents that are listed on these tables?

. . .

A. Not that I'm aware of. I know the water supply well did have a few detections in it but they were deemed by our state epidemiologist not to be a health risk.

. . .

Q. Is there anything in the regulations that requires [defendant] to actively remediate on the [plaintiffs'] property?

A. If they had levels that were considered above gross contaminant levels we would – we would require them to do additional work. I don't know that it specifically stated that in the regulations but we would consider that significant enough that we would require them to go on [plaintiffs'] property and clean up – do some additional active clean up.

Q. Did you find that in this situation?

A. I did not.

On cross-examination, plaintiff Kelley testified that, after filtration, he continues to drink the well water on his property every day. He also continues to

bring his children to the property regularly.  Plaintiff Kelley further testified that he

can continue to use his property as he has always used it in the past[6]:

> Q. Up until you received this letter from [DENR] in November of 2010, did you ever have any issues with your water tasting like gasoline?
>
> A. No.
>
> Q. Have you ever had any issues with the water tasting like gasoline?
>
> A. No.
>
> Q. Anybody ever complained about the quality of your water?
>
> A. No.

---

[6] It is worth noting that heretofore all cases involving leaking USTs in North Carolina dealt with property where the potable well was contaminated to at least a noticeable and/or dangerous level and where most parties with contaminated water were specifically advised not to drink or otherwise use their water. *Wilson v. McLeod Oil Co.*, 327 N.C. 491, 503, 398 S.E.2d 586, 591 (1990) (involving well water contaminated with gasoline which plaintiffs noticed smelled like gasoline); *Lancaster v. N.C. Dep't of Env't & Natural Res.*, 187 N.C. App. 105, 106, 652 S.E.2d 359, 360 (2007) (involving an action where well water "tests revealed high levels of benzene and other gasoline constituents"); *Hodge v. Harkey*, 178 N.C. App. 222, 223, 631 S.E.2d 143, 144 (2006) (noting that, in ordering the defendants/responsible parties to take action with respect to the contamination on plaintiffs' property, defendants were *ordered* by DENR to construct a new water supply well for plaintiffs and defendant additionally provided bottled water during the interim); *Ellington v. Hester*, 127 N.C. App. 172, 173, 487 S.E.2d 843, 844 (1997) (involving a contamination case where "plaintiffs noticed that their drinking water had a foul odor and a bad taste and the plaintiffs developed skin irritations from contact with the water"); *Crawford v. Boyette*, 121 N.C. App. 67, 69, 464 S.E.2d 301, 303 (1995) (involving well water contamination where plaintiff was warned that, based on the water's benzene level, the "water should not be used for drinking or cooking. Prolonged bathing/showering should be avoided"); *James v. Clark*, 118 N.C. App. 178, 180, 454 S.E.2d 826, 827 (1995) (noting that plaintiffs alleged "problems with their well water, including bad taste and other physical signs" of contamination from gasoline); *Jordan*, 116 N.C. App. at 158, 447 S.E.2d at 493 ("*Any* continued water use from this well for *any* purposes may pose a significantly increased long-term cancer risk.  It is strongly recommended that all use of water from this well be discontinued immediately.").

Plaintiffs mainly take issue with the fact that all active remediation is taking place solely on defendant's property while no active remediation is taking place on plaintiffs' property. It is primarily for this reason, plaintiffs argue, that plaintiffs should be awarded reparation costs so plaintiffs may clean their property in a manner of their choosing, rather than having to rely on the beneficial, collateral effects of defendant's cleanup efforts on defendant's property. Specifically, plaintiffs requested $1,131,000.00 to conduct their own, separate cleanup, pursuant to a plan recommended by their environmental engineer, Raymond. Raymond proposed chemical oxidation and a groundwater barrier remediation system and proposed drilling injection wells—a process requiring state approval that plaintiff had not yet sought from DENR and, therefore, had not obtained. While plaintiffs' proposed plan would take place actively on plaintiffs' property, and is purported to be able to clean the property more quickly, admittedly, it is a method that is infrequently, if ever, used in North Carolina. Plaintiffs' argument as to the need for active remediation on its property is not persuasive.

Plaintiffs also argue that the "personal reasons" exception allows plaintiffs to recover the full restoration costs even if those costs exceed diminution in value. As stated previously, when a landowner wishes to continue use of contaminated property for personal purposes, even restoration costs exceeding the land's value may be deemed equitable. *Plow*, 57 N.C. App. at 162–63, 290 S.E.2d at 789. The trial court

found conclusively, however, that the "personal use doctrine" would not apply in this case because plaintiffs are corporations, and the property is being used for business purposes or the production of profit or pecuniary gain, not as a homestead or for other individual uses or for the enjoyment of the public. We agree.

Plaintiff argues that the fact that plaintiffs are corporations does not automatically disqualify them from having personal reasons to want to restore their property. Plaintiff cites several cases from other jurisdictions in support of this proposition. *See Alaska Greenhouses*, 517 P.2d at 1387 (awarding restoration damages to a plaintiff corporation which planned to develop the damaged property as a nursery with greenhouses); *Roman Catholic Church of Archdiocese of New Orleans v. La. Gas Serv. Co.*, 618 So.2d 874, 880 (La. 1993) (awarding full restoration damages where the Church operated an apartment complex on the damaged property); *Sunburst*, 338 Mont. at 287–88, 165 P.3d at 1098 (awarding full restoration damages in a case brought by a school district and numerous homeowners following the explosion of a residence and contamination of residences with a known carcinogen).

Plaintiffs' case is highly distinguishable from the cases cited above. Plaintiffs' first argument with regard to the personal use exception is that plaintiffs' corporations are for all practical purposes the alter ego of one individual, Brad Kelley. Kelley is the sole shareholder and president of both corporations, BSK and Brad Kelley Enterprises. Kelley is BSK's only employee and Brad Kelley Enterprises has

approximately five employees. Kelley contends that his primary reason for buying the property at issue was because of its location and proximity to his home and his children's school and because it suited his needs for his coffee and water business. Plaintiff Kelley attests that, as a single parent, he frequently picks his daughters up from school and brings them to work for supervision until his work ends. These reasons are unpersuasive for application of the "personal use" doctrine.

Notably, both *Sunburst* and *Roman Catholic Church* involved restoration awards for damage to or destruction to residences—places where individuals actually lived. *See Roman Catholic Church*, 618 So.2d at 875–76; *Sunburst*, 338 Mont. at 272, 165 P.3d at 1088. Even though corporations or businesses were involved in the separate actions (in *Sunburst*, a school district, and in *Roman Catholic Church*, a church), the ultimate damage in the above cases was done to personal residences.

Here, Plaintiff Kelley's statement that his work is close to his home and that his children come to the property after school in no way establishes plaintiffs' property as a "homestead" for purposes of application of the "personal use" doctrine. Plaintiffs have offered no evidence to suggest that Plaintiff Kelley and his children live on or have ever resided on the property at issue. Rather, the trial court found that plaintiffs are corporations and the property is being used for business purposes or for pecuniary gain, and we agree with the trial court's conclusion that the "personal use" doctrine does not apply.

The *Alaska Greenhouses* case is distinguishable from the other two cases mentioned above, in that restoration damages were awarded to a plaintiff—a family business, which intended to develop the property for horticultural purposes—following excavation projects and the rerouting of a creek by adjoining landowners, defendant corporations, which caused numerous trespasses on the plaintiff's property, extensive damages to trees and ground cover, and erosion. 517 P.2d at 1381. In *Alaska Greenhouses* there was no discussion of the personal use doctrine; the Alaska Supreme Court simply found that a restoration damage award of $50,000.00 per acre where the plaintiff paid only $4,000.00 per acre was not in error. *Id.* at 1387. This Alaska state case has no binding authority on this Court. Moreover, where the court did not address the issue before us regarding the personal use doctrine, there can be nothing persuasive in such a case that lacks any analogous reasoning to the instant case.

We find that none of the above cases support plaintiffs' argument that restoration damages in the amount of $1,492,000.00 are appropriate in this case. While defendant has admitted that it caused the release of petroleum products into the groundwater on defendant's property, which in turn migrated onto plaintiffs' property and contaminated it, there has been no substantial interference with plaintiffs' use of the property. The migration of the dissolved phase plume from defendant's property to plaintiffs' property is a trespass and nuisance that does give

rise to liability. However, despite the current remediation already taking place, plaintiff Kelley's sole concern was just to have the property cleaned quickly:

> Q. . . . [W]hat was your primary concern?
>
> A. With the contamination?
>
> Q. Yes, sir.
>
> A. My primary concern is getting it cleaned up.
>
> Q. Do you have any concerns about the clean up [sic] plan proposed – excuse me the present clean up [sic] plan, a [CAP]?
>
> A. Yeah.
>
> Q. What are your concerns?
>
> A. Again, as I stated it has been years and years and nothing has been done. I mean there's no clean up going to happen on my property, according to my understanding of that plan. They are only proposing to clean up their property and that hasn't even started and it has been years and years, so I don't know if that is ever going to start. Is it going to start, stop, I just don't know. I'm just kind of stuck.

Plaintiff Kelley references no damage that interferes with his ability to conduct his business on the property. In fact, plaintiffs had no knowledge of contamination of the groundwater until 8 November 2010, when Terraquest circulated a well survey.

Nowhere in our jurisprudence is it stated that we are required to accept plaintiffs' evidence that a certain amount is required for replacement or remediation

when that amount is not reasonable.  The *Restatement (Second) of Torts* § 929 states in pertinent part:

> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
>
>> (a) the difference between the value of the land before the harm and the value after the harm, or at his election *in an appropriate case*, the cost of restoration that has been or may be reasonably incurred . . . .

*Restatement (Second) of Torts* § 929(1)(a) (emphasis added); *see also Phillips*, 231 N.C. at 571, 58 S.E.2d at 347 ("[The diminution-in-value] rule, *which can be an approximation to truth in a limited number of cases*, is often too remote from the factual pattern of the injury and its compensable items to reflect the fairness and justice which the administration of the law presupposes.  For that reason it is applied with caution, and often with modifications designed to relax its rigidity and fit it to the facts of the particular case." (emphasis added)).

This is not "an appropriate case" for awarding cost of restoration damages.  Plaintiffs' alleged costs of remediation and the jury's finding regarding costs of remediation are not reasonable under the circumstances.

Comment b on Subsection (1), Clause (a), of section 929 of the Restatement also states that

> [i]f . . . the cost of replacing the land in its original condition

is disproportionate to the diminution in value of the land
caused by the trespass, unless there is a [personal reason
to restore], damages are measured only by the difference
between the value of the land before and after the harm.

*Restatement (Second) of Torts* § 929(1)(a) cmt. b. The cost of replacing plaintiffs' land in its original condition, based on plaintiffs' cleanup plan and the jury award—$1,492,000.00—is more than thirteen times the diminution in value as found by the jury—$108,500.00. The trial court's determination that not only is this award disproportionate, as no personal use exception applies, but the award is also unreasonable under the circumstances, is supported by the record.

We hold that where no personal use exception applies, and the cost of remediation to property is disproportionate to or greatly exceeds the diminution in value of the property or is otherwise unreasonable under the circumstances, the cost awarded should be the diminution in value of the property. *See Restatement (Second) of Torts* § 929(1)(a) cmt. b. Accordingly, the trial court's post-verdict order entering a judgment in favor of plaintiffs for damages for nuisance, trespass, and violation of OPHSCA in the amount of $108,500.00 was not erroneous.

*Defendant's Appeal*

*I*

On cross-appeal, defendant first argues that the trial court erred in not dismissing plaintiffs' claims because the court lacked subject matter jurisdiction. Specifically, defendant argues that plaintiffs lack standing to bring an action to remediate groundwater contamination because groundwater is a public resource belonging to the State and is therefore not plaintiffs' private property. We disagree.

Standing refers to whether a party has a sufficient stake in a controversy so as to properly seek adjudication of the matter. *Neuse River Found. v. Smithfield's Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 51–52 (2002). Additionally, "[s]tanding is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Id.* at 113, 574 S.E.2d at 51.

With regards to the preservation of natural resources, the North Carolina Constitution states, in pertinent part, that:

> [i]t shall be the policy of this State to conserve and protect its land and waters for the benefit of its citizenry, and to this end it shall be a proper function of the State of North Carolina and its political subdivisions to acquire and preserve park, recreational, and scenic areas, to control and limit the pollution of our air and water . . . .

N.C. Const. art. XIV, § 5. In affirming the State's stewardship of water as a public resource, the legislature enacted N.C. Gen. Stat. § 143-211(a):

> Recognizing that the water and air resources of the State belong to the people, the General Assembly affirms the State's ultimate responsibility for the preservation and development of these resources in the best interest of all its citizens and declares the prudent utilization of these

resources to be essential to the general welfare.

N.C. Gen. Stat. § 143-211(a) (2013).

North Carolina has long held that water is a usufruct, which is the right to use water but not possess it. *Walton v. Mills*, 86 N.C. 280, 282 (1882) ("[One] has no property in the water itself, but a simple usufruct while it passes along."). North Carolina thus adheres to the "American Rule" of water use where the landowner has "the right only to a reasonable and beneficial use of the waters upon the land or its percolations or to some useful purpose connected with his occupation and enjoyment." *Bayer v. Nello L. Teer Co.*, 256 N.C. 509, 516, 124 S.E.2d 552, 556 (1992) (citation omitted).

North Carolina's adherence to the American Rule notwithstanding, the North Carolina Supreme Court has held that:

> the right to have a natural water course continue its physical existence upon one's property is as much property as is the right to have the hills and forests remain in place, and while there is no property right in any particular particle of water or in all of them put together, a riparian proprietor has the right of their flow past his lands for ordinary domestic, manufacturing, and other lawful purposes, without injurious or prejudicial interference by an upper proprietor.

*Hampton v. N.C. Pulp Co.*, 223 N.C. 535, 547, 27 S.E.2d 538, 546 (1943) (holding that the plaintiff had standing to sue where plaintiff owned a fishery business on a river and pollution from a pulp mill "destroyed or diverted the run of the fish so as to

seriously injure or destroy [the plaintiff's] business and diminish the value of his riparian property"). Furthermore, *Webster's Real Estate Law in North Carolina* defines "land" as follows:

> "Land" thus extends to include (1) the soil; (2) things growing naturally on the soil; (3) *the minerals and waters beneath the surface of the soil;* (4) the airspace that is above the soil so far as it may be reasonably reduced to possession and so far as it is reasonably necessary for the use and enjoyment of the surface . . . .

1-1 *Webster's Real Estate Law in North Carolina* § 1.07 (2013) (emphasis added).

Finally, OPHSCA holds polluters strictly liable for damages resulting from contamination of waters within the State and, additionally, OPHSCA was not intended "to limit any right or remedy available to a third party under any other provision of law." N.C.G.S. § 143-215.94B(b3).

Here, there is no dispute that plaintiffs owned the property at issue located at 4995 Reynolda Road, Winston-Salem, North Carolina. While it may be true that plaintiffs do not own outright the groundwater below their property, plaintiffs as landowners have "the right . . . to . . . the use of the waters upon the land or its percolations." *Bayer*, 256 N.C. at 516, 124 S.E.2d at 556. As such, plaintiffs had standing to bring an action against defendant for alleged trespass or damage caused to the groundwater beneath plaintiffs' land.

Based on the statutory authority conferred on the courts by OPHSCA, which creates a private cause of action for plaintiffs pursuant to N.C.G.S. § 143-215.94B(b3),

and plaintiffs' allegations regarding contamination to groundwater under land which plaintiffs owned and which plaintiffs had a legal right to use, plaintiffs had standing to sue and the trial court had subject matter jurisdiction under OPHSCA, as well as under the common law actions of trespass and nuisance.

## II

Defendant next argues that the trial court erred in submitting the damages issue related to diminution in value to the jury and omitting duty to mitigate instructions because plaintiffs refused to connect to municipal water. We disagree.

A request for a specific jury instruction must be submitted to the court in writing. N.C. Gen. Stat. § 1-181(a)(1) (2015). When a party requests a specific jury instruction, it should be given when " '(1) the requested instruction was a correct statement of law and (2) was supported by the evidence, and that (3) the instruction given, considered in its entirety, failed to encompass the substance of the law requested and (4) such failure likely misled the jury.' " *Outlaw v. Johnson*, 190 N.C. App. 233, 243, 660 S.E.2d 550, 559 (2008) (quoting *Liborio v. King*, 150 N.C. App. 531, 534, 564 S.E.2d 272, 274 (2002)). "[W]here the request for a specific instruction raises a question of law, 'the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court.' " *State v. Edwards*, ___ N.C. App. ___, ___, 768 S.E.2d 619, 620 (2015) (quoting *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009)).

Here, defendant submitted in writing to the court a proposed jury instruction on the duty to mitigate. During the charge conference, the trial court noted that the duty to mitigate issue was ruled on during pretrial conference, and the trial court again denied defendant's motion for the proposed duty to mitigate instruction. Defendant proposed the duty to mitigate instruction based on plaintiffs' failure to connect to city water.

Part 2A of OPHSCA, titled "Leaking Petroleum Underground Storage Tank Cleanup," includes subsection (b3), which states the following: "This subsection shall not be construed to require a third party to connect to a public water system. Except as provided by this subsection, *connection to a public water system does not constitute cleanup* under Part 2 of this Article . . . ." N.C.G.S. § 143-215.94B(b3) (emphasis added). Because connection to city water, pursuant to the language of the statute, does not constitute cleanup, it is unclear, then, how connection to city water would have mitigated plaintiffs' damages.

Despite the language in subsection (b3), defendant's sole argument in support of its proposed duty to mitigate instruction is that plaintiffs' refusal to connect to city water "reveals that the true motivation here is increasing [plaintiffs'] monetary award, not preventing personal injury, inconvenience, interference, or curing the property's condition . . . ." Defendant offers no other evidence, other than plaintiffs' failure to connect to city water, which is specifically categorized by statute as not

constituting cleanup, in support of its proposed duty to mitigate instruction. Therefore, the trial court did not err in denying defendant's proposed instruction, as there was not enough evidence, if any at all, presented at trial to support such an instruction. Accordingly, defendant's argument on this point is overruled.

*III*

Next, defendant argues that the trial court erred in awarding damages for diminution in value related to stigma.[7] Defendant argues that allowing plaintiffs to recover the diminution in value would constitute a double recovery for plaintiffs since the cleanup process is currently ongoing. For the following reasons, we disagree.

North Carolina law bars recovery for stigma damages when damages relate to temporary or abatable nuisances. *Rudd v. Electrolux Corp.*, 982 F. Supp. 355, 372 (M.D.N.C. 1997); *see also Appeal of Camel City Laundry Co.*, 123 N.C. App. 210, 215–16, 219, 472 S.E.2d 402, 406, 408 (1996) (affirming the calculation of the "impaired value" of property, which included factoring in stigma associated with the property's contamination and remediation efforts).

Defendant argues that the award of $108,500.00 to plaintiffs constitutes stigma damages because it relates to a temporary, abatable nuisance that is currently being remedied and that, therefore, any diminution in value to plaintiffs' property is

---

[7] Stigma damages are "[d]amages resulting from a temporary harm that causes the fully restored property to be viewed as less valuable after the harm and produces a permanent loss of value." They are also referred to as "diminution damages." BLACK'S LAW DICTIONARY (10th ed. 2014).

temporary. In other words, defendant contends, the diminution in value of plaintiffs' property is related to the stigma associated with the contamination on the property, despite the fact that the contamination is currently being remediated pursuant to a state-approved plan.

Here, the trial court determined that plaintiffs' property's contamination, such as it is, is a "temporary or abatable nuisance." However, defendant mischaracterizes the trial court's measure of damages as awarded. Nowhere in the post-verdict order does the trial court indicate that the measure of damages as calculated involved factoring in stigma related to the property's contamination, nor does the trial court characterize or otherwise denominate the damage award as damages in value related to stigma. Rather, the trial court entered a judgment for "damages as a result of nuisance, trespass, and violation of [OPHSCA]." Additionally, defendant's proposed jury instruction regarding damages related to stigma was denied by the trial court. As the jury was not instructed on damages related to stigma, the jury's verdict could not have reflected an award of stigma damages. Accordingly, defendant's argument on this point is also overruled.

## IV

Finally, defendant argues that the trial court erred in denying defendant's motion for JNOV as plaintiffs' nuisance and trespass claims fail as a matter of law absent real and substantial interference. Specifically, defendant argues that, because

plaintiffs presented no evidence that the nuisance and trespass of the contaminated groundwater caused any actual injury to person or property, or that the contamination interfered with plaintiffs' use of their property, damages cannot be awarded. We disagree.

"Generally, when there is more than a scintilla of evidence to support a nonmovant's claim or defense, a motion for . . . judgment notwithstanding the verdict should be denied." *N.C. Indus. Capital, LLC v. Clayton*, 185 N.C. App. 356, 362–63, 649 S.E.2d 14, 20 (2007) (citation omitted).

A claim for trespass may be brought under North Carolina law for the migration of oil from the defendant's property onto the property of the plaintiff based upon a violation of N.C. Gen. Stat. § 143-215.93 (OPHSCA). *Jordan*, 116 N.C. App. at 166–67, 447 S.E.2d at 497–98. "The elements for a trespass caused by leaking hazardous substances are as follows: (1) plaintiff was in possession of the property; (2) the defendant himself, or an object under his control, voluntarily entered, caused to enter, or remained present upon plaintiff's property; and, (3) the entry was unauthorized." *Rudd*, 982 F. Supp. at 370 (citing *Jordan*, 116 N.C. App. at 166, 447 S.E.2d at 498)). To recover for nuisance, a plaintiff must show an unreasonable interference with the use and enjoyment of his property. *Jordan*, 116 N.C. App. at 167, 447 S.E.2d at 498 (citation omitted). Additionally, a nuisance "must affect the health, comfort or property of those who live near [it]. It must work some substantial

annoyance, some material physical discomfort to the plaintiffs, or injury to their health or property." *Pake v. Morris*, 230 N.C. 424, 426, 53 S.E.2d 300, 301 (1949).

Here, defendant has admitted that it caused the release of petroleum products into the groundwater on defendant's property, which in turn migrated onto plaintiffs' property and contaminated it. Plaintiffs have installed a filtration system on their drinking water well and numerous monitoring wells have been drilled on plaintiffs' property by defendant. Crews also come onto plaintiffs' property to routinely monitor those wells.

Defendant seems to argue that substantial injury to plaintiffs' health or property is required to sustain a claim of nuisance; however, the substantial annoyance (and discomfort) to which plaintiffs testified provides more than a "scintilla of evidence" in support of the trial court's denial of defendant's JNOV:

> Q. Tell me a little bit about how the water sampling well situation worked when they put them in.
>
> A. It was – I don't think they did them all at one time but they would show up with quite a few trucks and drill rigs and come out there and drill holes and the piping and things like down into the ground. They put some concrete where the holes are, the caps. They would do that and let them set up for a couple of days, come back. I don't know what else they were doing out there.
>
> Q. Did that interfere with your business at all?
>
> A. It was inconvenient. We had to stay out of their way, move trucks around, things like that, couldn't park in certain areas.

Q. Did it ever prevent your office from working on certain days?

A. There were a few times when they were drilling and it was so loud that we couldn't hear the phones and things so I sent the people out of the office.

. . .

Q. How often did that occur?

A. A hand full of times. Just basically when they were drilling with the rigs.

Q. Have you done anything – you guys are on – are you on city water or well water?

A. We're still on well water.

Q. Have you done anything to the well water since all this took place?

A. We have a filtration system in place now.

Q. What kind of filtration system?

A. It's a carbon block filtration system and then we have another one in the interior office too that is a multi-stage filtration system.

While it is true that trespass of the contamination to plaintiffs' groundwater did not cause any actual injury to person or property, effects of the contamination— well drilling—did interfere with the use of plaintiffs' property. Plaintiffs' business has been able to operate, for the most part, as it did before the presence of contamination, and plaintiffs continue to drink the well water. However, there was

testimony regarding substantial annoyance and some interference with comfort and use of the property as well as the need for filtration. Therefore, there is more than a "scintilla of evidence" to support plaintiffs' claim for trespass and nuisance, and thus, denial of defendant's motion for judgment notwithstanding the verdict was proper based on this record. Accordingly, defendant's argument is overruled.

We find that the trial court (I) did not err in holding that the damages necessary to remediate the contamination of plaintiffs' property were capped at $108,500.00; (II) had subject matter jurisdiction because plaintiffs had standing to bring an action to remediate groundwater contamination; (III) did not err in refusing to give a duty to mitigate instruction; (IV) did not err with regard to its damages award because damages were not related to stigma; and (V) did not err in denying defendant's motion for JNOV because plaintiffs' claims for trespass and nuisance did not fail as a matter of law.

AFFIRMED.

Judges CALABRIA and ZACHARY concur.